## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | MDL No. 09-md-2011 (PGG) |
| AMERIPRISE FINANCIAL SERVICES, INC. and SECURITIES AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR. BRUCE BENT II, and ARTHUR T. BENT, <br><br> Defendants. | No. 09-cv-1288 (PGG) |

### SECOND AMENDED COMPLAINT

Plaintiffs Ameriprise Financial Services, Inc. ("Ameriprise") and Securities America, Inc. ("Securities America") (collectively, "Plaintiffs") bring this action against Defendants Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Inc. ("Resrv Partners"), Bruce Bent Sr., Bruce Bent II, and Arthur T. Bent (collectively, "Defendants"). As required by the Court's November 25, 2009 Order in *SEC v. Reserve Management Company, Inc. et al.*, No. 09-cv-4346 (PGG) (the "SEC Action"), this action does not assert any claim against any Primary Fund Indemnitee that seeks an award that would be payable or subject to indemnification by the Primary Fund. The following allegations are based upon Plaintiffs' information, knowledge and belief; discovery obtained by Plaintiffs in this action; allegations and evidence set forth in the

SEC Action and other actions comprising this multi-district litigation ("MDL"); findings of the Court in the SEC Action; and allegations and evidence set forth in the administrative complaint filed by the Securities Division of the Commonwealth of Massachusetts against certain of the Defendants on or about January 13, 2009 (the "Massachusetts Action").

## SUMMARY OF ALLEGATIONS

1.      Throughout the days of September 15 and 16, 2008, after the announcement of Lehman Brothers' bankruptcy filing sent Lehman-related securities into a freefall, Defendants engaged in a systematic campaign to deceive Plaintiffs and the investing public into believing that the Primary Fund – their flagship money market fund – was safe and secure despite its substantial Lehman holdings.  That campaign involved both the knowing dissemination of false information to the Primary Fund's Board of Trustees, investors, including Plaintiffs, and rating agencies and, in the case of certain Defendants, the knowing concealment of the true effect of the Lehman holdings on the Fund.

2.      The Primary Fund is a money market fund that historically provided shareholders with a $1.00 per share net asset value ("NAV").  Like most investors in money market funds, Plaintiffs viewed the Primary Fund as a safe and stable option for the preservation of capital. Plaintiffs, who were seeking preservation of capital and virtually immediate access to their funds, understood money market funds, such as the Primary Fund, to be an attractive regulated alternative to bank deposits.

3.      On September 15, 2008, the day Lehman Brothers filed for bankruptcy protection, the Fund held $785 million in Lehman debt securities.  RMCI, the Primary Fund's adviser, was immediately besieged by shareholders seeking to redeem their shares based on fears that a decline in the value of the Fund's Lehman holdings could compromise the Fund's $1.00 NAV – known as "breaking the buck."

4.      In order to persuade investors to refrain from redeeming shares, and to induce new purchases of shares, Defendants systematically violated the antifraud provisions of the federal securities laws by, *inter alia*, misrepresenting material facts concerning the Primary Fund's status, most notably by falsely assuring Plaintiffs and other shareholders, the Fund's Board of Trustees and the rating agencies that RMCI had agreed to provide the Fund with sufficient capital to maintain its NAV at $1.00.  In the case of RMCI and the Bent Defendants, rather than comply with their fiduciary obligations as investment advisers, they placed their own financial and reputational interests ahead of the Fund and its shareholders.

5.      Defendants' campaign of misinformation came to an end at 4:00 p.m. EST on September 16, 2008, when RMCI disclosed that the Primary Fund had broken the buck, *i.e.*, its shares had declined in value below $0.995, the lowest point at which they could permissibly be rounded to $1.00.

6.      Defendants' misconduct on September 15 and 16 arose from a simple reality: unless Defendants could persuade shareholders that the $1.00 NAV of the Fund was absolutely safe despite the Fund's Lehman exposure, shareholders would continue to redeem shares in massive and unsustainable amounts.  Defendants also knew that Moody's and Standard & Poor's – both of which had assigned the Primary Fund their highest ratings – would likely initiate crippling ratings downgrades absent evidence of a plan to protect the $1.00 NAV, a scenario which would accelerate the pace of redemptions and increase the likelihood that the Fund would break the buck.

7.      In order to falsely assure shareholders, the Board, and the rating agencies that the Fund's $1.00 NAV would remain intact, and that the Fund remained a safe and liquid

investment, Defendants published, or authorized the dissemination of, numerous materially false statements, including that:

    a.     RMCI "intended to protect" the $1.00 NAV of the Primary Fund to "whatever degree is required;"

    b.     RMCI and the Bents had sufficient capital available to maintain the Fund's NAV at $1.00 in the event it fell below that level;

    c.     RMCI was in the process of executing a credit support agreement whereby it would provide capital to the Primary Fund to allow it to maintain a per share NAV of $1.00;

    d.     RMCI had submitted a request for "no-action" relief to the Commission to implement a credit support agreement to protect the $1.00 NAV of the Fund, and expected such relief to be granted within hours; and

    e.     The Primary Fund was liquid and was timely honoring shareholder redemptions.

    8.     All of these statements of material fact were false. RMCI and the Bents did not intend to provide the levels of credit support necessary to maintain the NAV of the Primary Fund at $1.00 per share and, in fact, knew on September 15 that they would not do so even as they told shareholders, the Board and the rating agencies otherwise. Moreover, contrary to Defendant Resrv Partners' September 15, 2008 press release claiming that RMCI *already* had credit support agreements in place that would "ensure the integrity of a $1.00 NAV" for the Primary Fund and was submitting "appropriate documentation to the SEC," RMCI never implemented *any* such agreements or submitted *any* documents to the Commission.

    9.     On September 15, RMCI and the Bents also knew that the skyrocketing levels of redemptions by Fund shareholders had outstripped the Fund's ability to generate liquidity to pay those requests, a disastrous state of affairs for a money market fund. By approximately 10:10 a.m. on September 15, the Fund's custodian bank, State Street Bank and Trust Company ("State Street"), had suspended the Fund's overdraft privileges because of massive redemption outflows. Therefore, by approximately 10:10 a.m. on September 15, although the Fund was no longer in a

position to pay investors, redeeming shareholders had no knowledge of this critically important fact and continued to believe that they would timely be paid at the NAV of $1.00 per share.

10.     Public knowledge of the fact that the Primary Fund was illiquid would have irreparably damaged the Fund's and RMCI's reputation, prompted a downgrade in the Fund's ratings, and frustrated Defendants' ongoing efforts to falsely persuade investors that the $1.00 NAV was safe. As a result, RMCI and the Bents omitted or misrepresented material facts concerning redemption activity and the Fund's liquidity to the Fund's Board, shareholders, and rating agencies.

11.     The misinformation imparted by RMCI and the Bents on September 15, 2008 was intended to, and did in fact, prevent the Primary Fund's Board of Trustees from acting in an informed manner in setting the Fund's NAV. As a result, the process the Board used to strike the NAV of the Fund up until 4:00 p.m. on September 16, when RMCI disclosed the Fund had broken the buck, was hopelessly flawed, to the advantage of some investors who were the beneficiaries of redemption confirmations at an artificially derived $1.00 NAV and the disadvantage of others who were not.

12.     On September 15, 2008, in addition to the foregoing fraudulent conduct, the Defendants made a number of selective disclosures of non-public material facts to certain major institutional investors regarding the value and liquidity of the Fund. These selective disclosures had the effect of causing and/or increasing massive redemption activity in the Fund on September 15 – causing the proverbial "run on the bank" at the Fund.

13.     Almost $41 billion of the $62 billion in the Fund on September 15, 2008 was the subject of redemption requests that day. Of the tens of billions of dollars in redemptions submitted by shareholders on September 15, approximately $11 billion of redemptions were

processed and paid that day at the full $1.00 NAV. The Defendants knew at the time these distributions were being paid that the true NAV of the Fund was no longer $1.00.

14.     Since September 15, 2008, dozens of lawsuits have been filed by investors in the Primary Fund, including an action filed by Plaintiffs in the District of Minnesota, against Defendants and the Fund, among others. The vast majority of these actions, including Plaintiffs' lawsuit, have been consolidated for pre-trial purposes under a Transfer Order issued by the United States Judicial Panel on Multidistrict Litigation in *In re: The Reserve Fund Securities and Derivative Litigation*, MDL No. 2011 (Feb. 10, 2009).

15.     On December 3, 2008, the Primary Fund announced a plan of distribution of its remaining assets that would withhold at least $3.5 billion from shareholders indefinitely until all pending and future lawsuits were resolved. In light of the potential prejudice and extensive delay this plan would cause for shareholders, the SEC initiated the SEC Action against Defendants on May 5, 2009 to compel the distribution of all remaining Fund assets on a *pro rata* basis.

16.     After months of pleadings by various parties, this Court issued an Order on November 25, 2009 enjoining the Primary Fund's Plan of Liquidation and ordering that the Fund's remaining assets be liquidated and distributed on a *pro rata* basis to all Primary Fund shareholders who had not yet received $1.00 per share owned on or after September 15, 2008. However, the Order required that an Expense Fund, in the amount of $83.5 million, be created from the Fund's assets to cover indemnification expenses and management fees and expenses. The November 25 Order also permanently enjoined any action or proceeding of any kind from being asserted against the Primary Fund or any of its potential indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund.

17.     Defendants filed a letter dated January 29, 2010 with this Court on February 1, 2010, stating that $3.4 billion of the remaining $3.56 billion of Primary Fund assets had been distributed to the Fund's shareholders.  Approximately $160 million remains in the Fund to cover certain claims for indemnification expenses, management fees and other costs as approved by this Court.

18.     Of the approximately $11 billion worth of redemptions improperly paid on September 15, 2008 at the full $1.00 NAV, none has been recouped by the Fund to date.  As a result, the *pro rata* distributions made to Fund shareholders on or about January 29, 2010 were less than they otherwise should have been.

19.     As of the close of business on Friday, September 12, 2008, Ameriprise had approximately $1.2 billion of client assets invested in the Primary Fund, as well as approximately $25 million of its own capital.  This amount had increased to approximately $100 million as of the close of business on Tuesday, September 16, 2008.

20.     As of the close of business on Friday, September 12, 2008, Securities America had approximately $2 billion of client assets invested in the Primary Fund, as well as $28 million of its own capital.

21.     Following the various distributions of Fund assets that have been made, including the *pro rata* distribution on or about January 29, 2010, Plaintiffs have yet to recover approximately $20 million of Fund investments to which they are entitled.  These damages are the direct result of the Defendants' wrongful conduct alleged in greater detail below.

22.     Plaintiffs bring claims under and pursuant to Section 10(b) and 20 of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(e)) and Rule

10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5); Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (15 U.S.C. §§ 77k and 77o); and related state law claims.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

24.     Venue is also proper in the District of Minnesota, where this action was originally filed and where it will be remanded for trial, pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Minnesota.  Venue is also proper in this District pursuant to the multi-district litigation provisions of 28 U.S.C. § 1407.

25.     Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

## PARTIES

26.     **Plaintiff Ameriprise** is a registered broker-dealer and wholly-owned subsidiary of Ameriprise Financial, Inc.  Ameriprise is organized under the laws of Delaware with a principal place of business in Minneapolis, Minnesota.  In 2009, Ameriprise paid its clients who had invested in the Primary Fund through Ameriprise up to 3 cents on the dollar in order to reimburse them for their losses in the Primary Fund, and in turn, Ameriprise was assigned those clients' rights to proceed against the Primary Fund and the Defendants herein.

27.     **Plaintiff Securities America** is a registered broker-dealer and wholly-owned subsidiary of Ameriprise Financial, Inc.  Securities America is organized under the laws of Delaware with a principal place of business in La Vista, Nebraska.  In 2009, Securities America paid its clients who had invested in the Primary Fund up to 3 cents on the dollar in order to reimburse them for their losses in the Primary Fund, and in turn Securities America was assigned those clients' rights to proceed against the Primary Fund and the Defendants herein.

28.     **Defendant RMCI,** which carries out its business under the name "The Reserve," is a privately held corporation owned and controlled by Bruce Bent Sr. and his family, including Defendant Bruce Bent II and Defendant Arthur Bent, with its headquarters and principal place of business in New York, New York.  RMCI has been registered with the SEC as an investment adviser since 1984.  In 2008, RMCI provided investment advisory services to five registered, open-end, investment companies set up as trusts, offering a total of 22 open-end investment portfolios (collectively, the "Reserve Funds").  RMCI had approximately $120 billion in assets under management as of September 12, 2008.

29.     **Defendant Resrv Partners** is a broker-dealer registered with the Commission and a member of FINRA.  Resrv Partners is the distributor for the funds managed by RMCI.  The Bents collectively own and control Resrv Partners.  Resrv Partners has its headquarters and principal place of business in New York, New York.

30.     **Defendant Bruce Bent Sr.** was at all relevant times Chairman and President of RMCI; Chairman, President, Treasurer and Trustee of the Reserve Fund; and Chairman of Resrv Partners.  Bent Sr. has been employed by The Reserve companies since 1971.  Bent Sr. resides in Manhasset, New York.

31.     **Defendant Bruce Bent II** was at all relevant times Vice Chairman and President of RMCI; Co-Chief Executive Officer, Senior Vice President and Assistant Treasurer of the Reserve Fund; and an officer and director of Resrv Partners.  Bent II has been employed by RMCI since 1991.  Bent II resides in Manhasset, New York.

32.     **Defendant Arthur T. Bent** was at all relevant times Co-Chief Executive Officer, Senior Vice President, and Secretary of the Reserve Fund; Chief Operating Officer, Treasurer, Senior Vice President, and Assistant Secretary of RMCI; and an officer and director of Resrv Partners.

33.     **The Reserve Primary Fund** is a series of the Reserve Fund, a Massachusetts business trust registered with the SEC under the Investment Company Act as an open-end investment company.

## DEFENDANTS' FRAUDULENT CONDUCT

### Overview Of Relevant Reserve Entities

34.     Defendant Bruce Bent Sr. is the public face of the Reserve, and a longtime purported and self-styled advocate of the safety and stability of money market funds.  Bent Sr. and his family own and control Defendants RMCI and Resrv Partners.

35.     Defendant Bruce Bent II is Bent Sr.'s son and, in his capacity as Co-Vice Chairman of RMCI, had shared responsibility for overseeing RMCI's business operations, including on September 15 and 16, 2008.

36.     Defendant Arthur Bent is Bent Sr.'s son and, in his capacity as Chief Operations Officer of RMCI, had shared responsibility for overseeing RMCI's business operations, including on September 15 and 16, 2008.

37.     The Bents at all material times effectively exercised control and decision-making authority over RMCI's investment advisory business, including with respect to the management

of the Primary Fund.  In the case of Bent Sr., he (among other things) reviewed and approved the list of issuers from whom the Primary Fund could purchase securities, and chaired RMCI's Credit Committee. The Bents mandated, as part of RMCI policy, that they approve all public communications, including shareholder communications, prior to dissemination.

38.     In the case of Bent II, he oversaw the Marketing and Sales divisions of RMCI, and supervised RMCI's Chief Investment Officer.  Moreover, as alleged herein, Bent Sr. and Bent II, acting in their capacities as investment advisers, played the key roles on September 15 and 16 with respect to RMCI's dealings with the Independent Trustees of the Board, shareholders and the rating agencies concerning the Fund's Lehman holdings and other matters. As set forth below, upon learning of Lehman's bankruptcy filing, the Board relied upon Bent Sr. and Bent II to provide them with timely and accurate information concerning, among other things, the appropriate valuation of the Fund's Lehman debt.

39.     At the time of the transactions and events alleged in this Complaint, and as a result of the control and influence alleged further herein, the Bents each were controlling persons of RMCI under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

**The Primary Fund Was Marketed As A Conservative and Liquid Money Market Fund**

40.     RMCI's flagship fund, the approximately $62 billion Primary Fund, was marketed as a money market fund from its inception.  For example, within the various Prospectuses Defendants filed with the SEC, Defendants touted the Primary Fund as a "money market fund[], designed as a convenient alternative to the direct investment of temporary cash balances in short-term investments."

41.     As a money market fund, the Primary Fund was subject to stringent regulations pursuant to Rule 2a-7 of the Investment Company Act designed to ensure their safety and liquidity.  To qualify as a money market fund under Rule 2a-7, the Primary Fund was required to

maintain a conservative investment portfolio that was: (i) sufficiently safe – as measured by, among other criteria, the ratings of the underlying securities held by the Fund, and (ii) sufficiently liquid – as measured by, among other things, the weighted maturity dates of all assets held by the Fund.

42.    Rule 22c-1(b)(1) under the Investment Company Act requires money market funds to compute their net asset values "no less frequently than once daily, Monday through Friday, at the specific time or times during the day that the board of directors of the investment company sets." Unlike most other money market funds, which compute a per share NAV on a once daily basis, the Primary Fund, pursuant to its Prospectus, computed its NAV on an approximately hourly basis. In the ordinary course, shareholders would, after submitting their redemption requests to RMCI, receive payment at some point within the next hour in the form of a wire transfer initiated by State Street, the custodian bank for the Reserve Fund, at that hour's NAV.

43.    Defendants further emphasized the conservative nature of the Primary Fund by stating in their Prospectuses that "because money market funds may only invest in securities with a lower level of risk, over time they may produce lower returns than investments in stocks or bonds, which entail higher levels of risk." The Prospectuses further stated that "[d]ifferent investors have different investment goals. Investments in money market funds provide greater security and liquidity than other types of investments but do not usually offer as high a rate of return."

44.    Moreover, Bent and other Defendants caused Statements of Additional Information ("SoAI"s) to be filed with the SEC and incorporated into their Prospectuses. These SoAIs stated that "[t]he investment objective of each Fund is to seek as high a level of current

income as is consistent with preservation of capital and liquidity. This investment objective is a fundamental policy and may not be changed without the vote of a majority of the outstanding shares of the Fund as defined in the Investment Company Act."

45.    Significantly, the SoAIs also stated that "[i]nvestments in commercial paper will be of high quality" and that if a security's high-quality rating changes after purchase by the Primary Fund, Defendant RMCI assured it would undertake any action "determined to be in the best interest of the Fund."

46.    Bent and other Defendants themselves promoted the Primary Fund's focus on "sanctity of principal, immediate liquidity," and an "overarching rubric of boring investors into a sound sleep," noting that "the cash entrusted to a money fund is your reserve resource that you expect to be there no matter what. . . . This is definitely not money to take risks with, and that is exactly how it should be managed."

**The Primary Fund's Redemption Procedures**

47.    Defendants' SEC statements discussing the Fund's redemption procedures further emphasized the liquidity of the Primary Fund. For example, the 2006 and 2007 Prospectuses stated that "[y]ou may redeem your shares on each day that the Primary Fund's NAV is calculated. Shares will be redeemed at the next NAV determined after a proper redemption request, by telephone or in writing, is received by the Primary Fund, or by an authorized financial intermediary."

48.    Until September 15, 2008, the Primary Fund's hourly NAV calculation was mechanical in nature, as the Fund's holdings were all carried at amortized cost (as permitted under Rule 2a-7), meaning the Fund's hourly per share NAV remained constant at $1.00. If however, the Board determined that a given security should no longer be valued at amortized cost, and should be assigned a "fair value" – as it did with the Lehman holdings following

Lehman's bankruptcy -- the Board would rely upon RMCI to provide it with timely and accurate information to ensure that the assigned fair value remained accurate in light of available market data and conditions.

**The Primary Fund's Increasingly Risky Investment Profile**

49.     From its inception in 1971, consistent with its stated investment objective, the Primary Fund invested in very conservative assets, such as government securities and bank certificates of deposit.  The Fund also carried the highest possible ratings from Moody's and Standard & Poor's denoting safety and liquidity, a fact which RMCI repeatedly highlighted in its promotional materials.

50.     In 2007 and 2008, however, the Fund began to purchase riskier commercial paper issued by financial institutions, including Lehman, Merrill Lynch, and Washington Mutual.  The higher yields paid by these securities generated attractive returns for Fund shareholders, and helped the Fund attract billions of new dollars in investments, which in turn increased the management and advisory fees earned by RMCI.

51.     The Primary Fund's shifting investment strategy, and substantial increase in assets under management, had significant implications given RMCI's status as a private family-owned company.  Unlike many other large mutual fund complexes, RMCI, and the funds it advises, are not owned, or otherwise affiliated with, a large public company or commercial bank with the resources to provide financial support in the event a portfolio security were to become impaired.  To the contrary, in the event a Primary Fund holding declined in value to the point where it threatened the Fund's $1.00 NAV, the Fund's ability to maintain a stable $1.00 NAV depended exclusively on the Bent family's ability and willingness to provide or secure capital -- either personal resources, those of RMCI, or from some third party to support the NAV.

52.     While an investment adviser such as RMCI is under no legal obligation to provide financial support to maintain the $1.00 NAV of a distressed money market fund, breaking the buck is a catastrophic development for a money market fund and its shareholders.  Although agreements to protect a fund's $1.00 NAV can be implemented in a variety of ways, they generally require a fund adviser or other third party to commit financial resources to protect a fund's $1.00 per share NAV, *e.g.*, by providing the fund with capital to maintain the $1.00 NAV, by providing capital to offset the decline in value in the impaired security, or by purchasing the impaired security out of the portfolio.

53.     Despite the Primary Fund's shifting investment philosophy, RMCI continued to tout its sound investment strategy, stating as late as September 12, 2008 to the *Wall Street Journal* that the Primary Fund was designed to "bore the [] investor into a sound night's sleep."

54.     The Defendants were fully aware prior to September 15, 2008 of the devastating reputational and business damage that would arise if a fund managed by RMCI broke the buck. To avoid this very result, in 2007, RMCI and the Bents agreed to provide millions of dollars in credit support to maintain the $1.00 per share NAV of The Reserve Enhanced Cash Strategies Portfolio, LLC, a smaller non-money market fund that sought to maintain a $1.00 NAV.

**RMCI Ignores Issues Raised By Moody's**

55.     In or about July 2008, as part of its ratings review process, Moody's sought information from rated money market funds, including the Primary Fund, about whether they had engaged in contingency planning for responding to adverse credit events.  As part of this inquiry, Moody's asked fund advisers, including RMCI, whether they had in place, or were prepared to enter into, a credit support agreement to protect the $1.00 NAV of their money market funds in the event of a credit event.

56.     In a meeting with the Bents on July 18, 2008 at RMCI's offices specifically called to discuss, in part, RMCI's contingency planning, Moody's asked the Bents whether they had considered the impact on the Primary Fund of an unforeseen credit event and whether RMCI and/or the Bents were willing and financially capable of supporting the $1.00 NAV of the Fund in such a situation.  The Bents provided Moody's with general assurances that they were committed to the Fund and that they could, if necessary, execute a personal note to support the Fund.

57.     Such statements and assurances to Moody's were false.  In fact, RMCI did not develop or even consider internally the type of contingency plan discussed with Moody's or investigate the credit support agreements that had been utilized by other money market funds even though the form of such agreements was often publicly available.

**RMCI Ignores Lehman's Potential Impact On The Reserve Funds**

58.     Throughout the summer and first half of September 2008, RMCI maintained that Lehman's financial condition – which the financial press and rating agencies had described as increasingly troubled – did not pose a risk to the three Reserve funds with Lehman exposure (the Primary Fund, Yield Plus Fund, and International Liquidity Fund Ltd.).  For example, in a meeting of the Primary Fund's Board of Trustees on September 10, 2008, RMCI's Chief Investment Officer ("CIO") and Bent Sr. assured the Board that the Reserve Fund's Lehman exposure did not constitute a threat to any of the funds.

59.     Likewise, on September 12, 2008, a Moody's employee sent an email to the CIO seeking the "Reserve's view of the [Lehman] credit?  I know you have some exposure into 2009."  In the subsequent exchange of emails, the CIO indicated that RMCI was "ok holding what we own," and that Lehman would, if necessary, be assisted by the federal government.  In the same

email exchange, Moody's told the CIO that it wanted to discuss the increasingly risky nature of the Fund's portfolio, which was "pushing up against the boundaries for AAA rating."

60.     Even as RMCI downplayed concerns about Lehman, by August 2008, certain shareholders were beginning to question RMCI sales personnel about whether it was appropriate for the conservative Primary Fund to continue to hold substantial positions in Lehman debt. Over time, these concerns became more pointed, and during the week of September 8, 2008, RMCI's sales personnel reported to senior RMCI management – including Bent II – that investors were increasingly likely to redeem their shares as a result of the Primary Fund's exposure to Lehman.

61.     It was not until the evening of September 14, 2008 (when Lehman's bankruptcy filing appeared inevitable and just hours before the actual filing) that RMCI began belatedly to consider the impact of a Lehman bankruptcy on its flagship fund.

62.     Anticipating that shareholders would seek assurances that RMCI would, if necessary, provide financial support to maintain the Fund's $1.00 per share NAV, at 5:35 p.m. on Sunday, September 14, RMCI's Director of Marketing told Bent II via email that earlier in 2008, "other fund companies which had significant [structured investment vehicle] exposure calmed investors by stating they had line of credits [sic] available – not sure how or even if this would apply to any [L]ehman exposure ... ." Bent II responded by stating that "this is not an option for us," indicating that as of September 14, RMCI and the Bents were not able or inclined to provide credit support to protect the $1.00 NAV of the Primary Fund.

63.     At 10:24 p.m. on September 14, Bent II instructed several senior RMCI employees via email to begin working on a public relations "piece that assumes Lehman liquidates." Bent II's message was clear: RMCI needed to address shareholders' fears about the

Primary Fund's ability to withstand a Lehman bankruptcy "so we don't have a run on the fund tomorrow which co[u]ld be a major problem in itself." Bent II further noted that, as of the night of Sunday, September 14, over "700 million to 1.5 billion [dollars] may be redeeming [Monday]."

64.     At the same time Lehman filed for bankruptcy, Bent Sr. was en route to a destination out of the country and was thereafter reachable only by telephone over the critical days of September 15 and 16.

65.     During the late evening of September 14, Bent II arranged for a meeting of the Primary Fund's Board of Trustees to be held at 8:00 a.m. the next morning.

66.     Shortly after midnight, in the early morning of September 15, 2008, Lehman Brothers Holdings, Inc. announced that it was filing for bankruptcy protection pursuant to Chapter 11 of the United States Bankruptcy Code.

67.     During the early morning on September 15, Bent Sr. and Bent II discussed whether they could arrange for the SEC and Federal Reserve to participate in the Board meeting scheduled for later that morning because of their concerns that the Fund would be profoundly impacted by the Lehman bankruptcy.

68.     At approximately 7:50 a.m. on September 15, 2008, the Bents contacted the Banking Division of the Federal Reserve Bank of New York to express their concerns that Lehman's bankruptcy would have a negative systemic impact on the money market fund industry, and in particular the Primary Fund given its size and reputation.  When the Board met just ten minutes later on September 15, the Bents did not disclose their decision to seek the intervention of the Federal Reserve or the concerns that had prompted such an extraordinary step so early in the day on September 15.

**The Board Meetings on September 15, 2008**

69.     The Board met three times on September 15 – first at 8:00 a.m., then at 9:30 a.m., and finally at approximately 1:00 p.m.  Participants, many of whom joined the meeting by telephone, included Bent Sr., who was out of the country, Bent II, certain Independent Trustees and their outside regulatory counsel, inside and outside counsel to RMCI and, at various times, certain managing directors of RMCI and a representative from KPMG LLP, the Primary Fund's outside auditor.

70.     As of the morning of September 15, 2008, the Primary Fund held approximately $62.4 billion in total assets, such that the Lehman debt, valued at par, constituted approximately 1.2% of the Fund's assets.  The likelihood that the Fund's Lehman debt would threaten the Fund's $1.00 NAV therefore depended on (i) whether and how far below par value the Fund, through its Board of Trustees, valued the Lehman holdings at any particular time, and (ii) the total assets of the Fund at that time.

71.     At the 8:00 a.m. Board meeting, the Board determined that it would no longer value the Lehman debt at amortized cost but that it required additional information to determine a fair value for the debt.  The meeting adjourned at 8:40 a.m. so that RMCI could gather market information about the pricing of Lehman debt.

72.     When the Board reconvened at 9:30 a.m. to determine a fair value for the Lehman debt, Bent Sr., Bent II and RMCI's CIO reported to the Board that there was "no valid market" for Lehman paper, with bids "being thrown out there anywhere from 45 to 80 [cents on the dollar]."  In reality, however, market data available to RMCI on the morning of September 15, which was shared with the Bents but not the Board, actually suggested that Lehman debt would trade no higher than between $0.30 and $0.40 cents on September 15.

73.     The Bents, not the CIO, made the decision about what recommendation to make to the Board at the 9:30 a.m. meeting about the appropriate valuation of the Lehman debt.  Bent Sr. recommended that the Board value the Lehman holdings at par, despite the fact that Lehman was a bankrupt entity whose estate would not likely make any payments on its debt until after months, if not years, of court proceedings.  After Bent Sr. conceded that he would not authorize RMCI to purchase the Lehman debt at par value, the Trustees resolved that 80% of par was an appropriate valuation as of approximately 10:00 a.m. on September 15.

74.     Before the meeting adjourned, the Board issued the explicit instruction to RMCI management to reconvene the Board if anything occurred "to call into question the $0.80" valuation, an instruction that was particularly critical given that the decision to value the Lehman debt at $0.80 had *already* reduced the Fund's per share NAV to approximately 0.9975 – halfway to breaking the buck – without even factoring in net redemptions, which were at that time already approximately $10 billion.

75.     Had a lower (and more realistic) valuation for the Lehman debt been used, the Primary Fund would have broken the buck on the morning of September 15.  In an email sent to the Bents at 10:48 a.m. on September 15, they were informed that a valuation of $0.80 did not "break the buck" but that a lower valuation of $.625 would "break the buck."

76.     Despite the explicit instruction of the Board to reconvene the Board if any information called into question the $0.80 valuation, and despite being in possession of market data showing that the Lehman Brothers debt would not trade any higher than between $0.30 and $0.40, the Bents acted willfully or with reckless disregard and/or gross negligence in not presenting such information to the Board in order to try to prevent the Primary Fund from breaking the buck.

77.     Exacerbating the situation,  Defendants violated their obligations to ensure the safety of the liquidity of the Primary Fund by making selective disclosures to certain major institutional investors regarding the value and liquidity of the Primary Fund.

78.     These disclosures included: (a) disclosing to selected investors the prospect that the Primary Fund could potentially "break the buck" due to exposure to Lehman holdings; (b) disclosing to selected investors different scenarios that might occur if the Primary Fund were in fact to "break the buck;" (c) disclosing to selected investors that it was impossible to determine the value of the Lehman debt held in the Primary Fund; (d) disclosing to selected investors that the Lehman debt in the Primary Fund was being valued at par, and that otherwise, the Fund might break the buck – notwithstanding that no reasonable investor was valuing the Lehman debt at par; (e) disclosing to selected investors that if the Lehman debt were to be valued at zero, the Fund could potentially "break the buck;" and (f) disclosing to selected investors that above normal levels of redemptions and activities were occurring in the Primary Fund.

79.     Defendants made these disclosures despite the admission of RMCI's CIO that such selective disclosures were "inappropriate" and despite the explicit policy posted on The Reserve's website that Defendants were prohibited "by law [to] give some investors information before [they] give it to others."  These selective disclosures had the effect of causing certain institutional investors to submit redemption requests to redeem their shares in advance of other investors, at the then-prevailing net asset value of $1.00 per share, and of further stampeding the run on the Fund.

80.     Moreover, on information and belief, Defendants wrongfully prioritized the redemption requests of large institutional and favored investors over other investors who filed

their redemptions first, leaving many investors out in the cold, again further stampeding the run on the Fund.

81.     For example, RMCI explicitly told State Street, in an email sent on September 15, 2008 at 8:33 a.m. to refund several large investors first,: "Bear Stearns has first priority with a redemption of 1,000,000,000.00. Farmer Mac [the Federal Agricultural Mortgage Corporation] has 2nd priority of 50,000,000 Pershing [Square Capital Management, L.P.] with a 3rd priority of 800,000,000.00 and 405 mm and 27 mm." A table attached to this e-mail lists each redemption request from 7:51 a.m. to 8:30 a.m. and shows that 21 redemption requests were received ahead of Bear Stearns, including Farmer Mac's (which was 13th) and Pershing's (which was 19th).

82.     As further evidence of this preference, one RMCI sales executive told a client that "we are obviously going to prioritize the large redemptions."

83.     Additionally, despite the clear cause for heightened vigilance by the Board as of mid-morning on September 15, RMCI did not disclose to the Board the actual level of redemptions during the 9:30 meeting, or the troubling fact that the rate at which they were being received was unprecedented in the history of the Fund.

84.     At approximately 10:10 a.m., shortly after the Board valued the Lehman debt at $0.80 of par, State Street, the Reserve Funds' custodian bank, stopped funding redemption requests placed by shareholders. As was customary, up until that point, State Street had wired funds to redeeming shareholders by applying the redemption amounts against an overdraft line of credit provided to RMCI. On September 15, however, the extremely rapid rate of redemptions – over $10 billion by mid-morning – caused State Street to suspend RMCI's overdraft privileges.

At the same time, by virtue of extreme illiquidity in the market, RMCI was unable to generate sufficient liquidity through sales of portfolio holdings to make up the redemption shortfall.

85.     As a result, while shareholders could and did continue to place redemption requests with RMCI — which they believed would entitle them to redemption at $1.00 per share based on a purportedly accurate hourly NAV strike — the Primary Fund lacked liquidity from State Street or any other source to fund those redemptions.  This highly material development should have been reported to the Board as soon as it came to the attention of senior RMCI management.  At no point on September 15, however, did RMCI, Bent Sr. or Bent II disclose this material fact to the Board; instead, they actively fostered the impression that the situation was under control.

**Defendants' False Representations Of Credit Support for the Fund's $1.00 NAV**

86.     Beginning in the early morning on September 15, Moody's and Standard & Poor's began to urgently seek information from the Bents about RMCI's plans for responding to Lehman's bankruptcy, including whether RMCI would, if necessary, take steps to protect the $1.00 per share NAV of the Primary Fund.  This information was critical to the rating agencies' assessments of whether to take adverse ratings action against the Fund.

87.     As early as 8:23 a.m. on September 15, Moody's began attempting to reach Bent Sr. to discuss RMCI's plans for responding to the Lehman crisis, including its willingness to support the Primary Fund's $1.00 NAV.  At approximately 9:15 a.m., the Bents spoke at length with Moody's to address Moody's desire to learn whether RMCI intended to protect the $1.00 NAV of the Fund.

88.     Moody's relayed its concerns and questions about RMCI's intentions to support the Primary Fund during another telephone call with RMCI's CIO at approximately 10:30 a.m.

89.     RMCI was also in contact with Standard & Poor's on September 15. At 12:57 p.m., RMCI's CIO emailed Bent II to report on the CIO's just concluded conversation with contacts at Standard & Poor's. "Similar to ... Moody's," the CIO wrote, "they are looking for some type of capital support facility to be put in place."

90.     At the same time the rating agencies began to press the Bents for evidence of their commitment to support the Primary Fund's $1.00 NAV, RMCI and Bent II became aware that Evergreen, another money market fund with sizeable holdings of Lehman debt, had, at the very outset of the day on September 15, publicly disclosed that it would protect its $1.00 NAV against any declines in the value of the Lehman debt. At 8:34 a.m., Bent II forwarded to RMCI's Director of Marketing a link to Evergreen's press release about its credit support agreement.

91.     At 8:38 a.m., the Director of Marketing responded, pointing out to Bent II that "the part it offers which we don't is the line of credit item from Wachovia. For us we need to deliver a message of confidence of [NAV] stability without any specific steps as outlined below." The email also noted that the Director of Marketing was sharing the Evergreen press release with RMCI's Sales Director, as it was likely that, in light of Evergreen's disclosure, Primary Fund shareholders would seek information about whether RMCI also intended to provide support for the Fund's $1.00 NAV.

92.     Around noon on September 15, Bent II requested another meeting of the Board. Despite having just stated in an email on September 14th that a line of credit was "not an option" for the Reserve, when the Board convened at 1:00 p.m., Bent II informed the Trustees that RMCI intended to implement a credit support agreement to protect the $1.00 NAV of the Primary Fund. He further stated that RMCI would seek immediate relief from the Commission to implement the credit support agreement, a threshold step that was required under the Investment Company Act.

93.     Given the $785 million in Lehman debt held by the Fund, the level of financial support potentially required to maintain a $1.00 NAV was substantial, particularly if redemptions continued to rise or the Board voted to further reduce the value of the Lehman holdings.  Upon hearing Bent II state RMCI's intention to provide credit support to the Fund, outside counsel for the Independent Trustees asked whether RMCI had adequate financial resources.  According to the minutes of the meeting, Bent Sr. reassured the Independent Trustees that RMCI had sufficient capital, leading the Trustees to ratify the plan to implement a credit support agreement for the Fund.

94.     As alleged more fully below, even as Bent II was informing the Board that RMCI intended to provide unqualified support to the Primary Fund, and Bent Sr. was representing that RMCI had sufficient financial resources for such an undertaking, RMCI and the Bents had not yet arrived at any decision concerning whether and to what extent RMCI would support the Primary Fund, and in fact never intended to support the Fund in a manner that would have had a remotely meaningful impact on the Fund's NAV.

95.     To the contrary, their decision to announce unqualified financial support for the Primary Fund was driven by a desire to falsely reassure shareholders that the Fund remained safe, thus slowing the rate of redemptions, and a desire to placate Moody's and Standard & Poor's, thus avoiding a calamitous ratings downgrade.

96.     In addition to falsely informing the Board that RMCI would maintain the Primary Fund's NAV at $1.00, at the 1:00 p.m Board meeting, RMCI and/or the Bents provided the Board with materially false information, or failed to provide them with material information, concerning other topics.  Those material misstatements and omissions included:

    a.     RMCI failed to disclose the vitally important fact that shareholder redemptions were no longer being paid as a result of State Street's suspension of overdraft

privileges such that the Fund was effectively illiquid, an omission that Bent II compounded by failing to subsequently inform the Board of this development at any point after the 1:00 p.m. Board meeting when he became personally involved in efforts to find additional sources of liquidity;

b.      RMCI vastly understated the actual level of redemptions as of 1:00 p.m. and the rising threat to the Primary Fund's $1.00 per share NAV as the percentage of Lehman debt began to make up a greater percentage of the Fund's shrinking asset pool;

c.      RMCI and Bent II failed to disclose the fact that the Yield Plus and International Liquidity Funds — both of which also held Lehman debt — had *already* broken the buck during the morning of September 15; and

d.      RMCI and Bent II failed to disclose that Bent II had already directed RMCI personnel to record receivables on the books of the Yield Plus and International Liquidity Funds to maintain their respective NAVs at $1.00, which would avoid disclosure of the fact that their NAVs had declined below $1.00.

97.      The Independent Trustees' ability to discharge their duties to the Fund on September 15 was fatally compromised by these misstatements and omissions. Because the Trustees were not provided with timely and accurate information concerning redemptions and the Fund's lack of liquidity, and were affirmatively misled into believing RMCI would, if necessary, support the Fund's NAV, they had no reason to believe that their decision to value the Lehman debt at $0.80 should be re-evaluated, and did not do so until well after the fact on September 16. Accordingly, the NAVs struck for most of the day on September 15 were not the product of a good-faith informed assessment of the facts.

**Bent II Authorizes False Statements Concerning Nonexistent Credit Support**

98.      Shortly after informing the Board at 1:00 p.m. that RMCI would support the $1.00 per share NAV of the Primary Fund, Bent II and RMCI began a concurrent effort to mislead shareholders. At 1:19 p.m., Bent II sent an email (the "1:19 Email") to RMCI's Directors of Sales and Marketing, copying the General Counsel, Bent Sr. and chief operating officer, that reads as follows:

We (Reserve Management Company Inc.) intend to protect the NAV on the Primary fund to whatever degree is required.  We have spoken with the SEC and are waiting [for] their final approval which we expect to have in a few hours.  You may communicate this to clients on an as needed basis.

…

[ ] if you want something on the website I need to see language for approval first, thanks.

99.    The 1:19 Email was materially misleading in multiple respects.  RMCI and the Bents did not intend to protect the NAV of the Primary Fund to "whatever degree was required."

100.    To the contrary, at the time Bent II sent the 1:19 Email promising unqualified support for the Primary Fund, RMCI and the Bents had not yet arrived at any decision concerning whether and to what extent RMCI and the Bents would support the Fund, and in fact never intended to provide unqualified support to the Fund.  Bent II's statement of unconditional support was thus false and misleading.

101.    The 1:19 Email was also materially false and misleading because RMCI could not reasonably state that it was awaiting "final approval" from the SEC, because RMCI had not even submitted a written request for no-action relief to the SEC for its consideration by 1:19 p.m. on September 15, and in fact never did so.

102.    Less than ten minutes after sending the 1:19 Email, Bent II placed separate telephone calls to Moody's and Standard & Poor's to further disseminate the false message that RMCI was implementing credit support agreements to protect the $1.00 NAV of the Primary Fund.  In the case of Moody's, Bent II represented that RMCI was entering into credit support agreements to protect the $1.00 NAV of the Primary Fund, the Yield Plus Fund, and the International Liquidity Fund, all of which held Lehman debt.

103.    Bent II purposefully sent the 1:19 Email to, among others, RMCI's Directors of Marketing and Sales to authorize them to falsely reassure the public that RMCI would provide unqualified financial support to the Primary Fund.  Bent II's goal was to convince investors to

stop redeeming shares in the Primary Fund by inducing them to rely on the false representation that RMCI would maintain the $1.00 NAV.

104.    Consistent with Bent II's authorization in his 1:19 Email that RMCI could communicate its unqualified support for the Primary Fund to "clients," RMCI's Director of Sales immediately read the Email to the sales force and instructed them to tell shareholders that RMCI would unequivocally protect the $1.00 NAV of the Primary Fund.  In some of these communications, members of the sales team informed investors that the Bents "definitively" "would step in and support our money-market funds," and take "whatever steps that are needed to support the NAV of the funds." As one salesperson explained, in typically unequivocal language, "we have a backstop and are going to ensure that the fund does not break a buck."

105.    By 2:00 p.m. on September 15, RMCI's Director of Sales reported internally that the message of unqualified credit support for the NAV of the Primary Fund was having the desired impact on unredeemed investors and was slowing the rate of redemptions.  The Director of Sales emphasized to Bent II at approximately 7:30 p.m. on September 15 via email that the false message of credit support had been instrumental in slowing the rate of redemptions: "the client base reacted positively to this news and the redemption activity slowed greatly."

**RMCI And Resrv Partners Disseminate A Materially False Shareholder Communication**

106.    Upon receipt of Bent II's 1:19 Email, RMCI marketing personnel began to finalize a press release describing RMCI's purported intent to protect the $1.00 per share NAV of the Primary Fund.

107.    During the afternoon of September 15, Bent II and Bent Sr. reviewed and commented on the draft press release, which falsely stated that RMCI "intends to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund." The draft also falsely stated that RMCI "believe[d] that the [Lehman] holdings will

mature at par value" even though the Board had already acted to value the Lehman debt at 80% of par.

108.   At 3:41 p.m. on September 15, a RMCI marketing employee circulated via email "the approved version of The Reserve's communication regarding this weekend's events with Lehman/Merrill and the position The Reserve is taking."  The email and attachment were addressed to RMCI's entire marketing and sales teams, which included Bent II.  A few minutes later, at 3:57 p.m., the Director of Marketing sent the same communication to, among others, all "Directors and Managers," a list that includes each of the Bents.  At no point did the Bents object to the contents of the shareholder communication.

109.   The "communication," titled "The Reserve *Insights*," and publicly distributed by Defendant Resrv Partners, repeated and amplified the false statements in Bent II's 1:19 Email, and included the following specific false statements:

a.   RMCI's "inten[tion] to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund," which RMCI and the Bents never intended to do, and never did;

b.   That RMCI was "submitting appropriate documentation to the SEC today, September 15, 2008," although no documentation had been, or was ever, submitted to the Commission;

c.   That "our support agreements ensure the integrity of a $1.00 NAV," a plainly false statement given that no such agreement ever existed; and

d.   That the Lehman holdings would not have a "material impact" on the Primary Fund or a "negative impact[]"on the NAV because the holdings would "mature at par value." In fact, the Board had already acted to value the Lehman debt at less than par and, by virtue of Lehman's bankruptcy filing, any payout on the debt would take months or years and would in all likelihood be at substantially less than par.

110.   During the afternoon and evening of September 15, members of RMCI's and Resrv Partners' sales team distributed the materially false and misleading "The Reserve *Insights*" via email to numerous shareholders located in multiple states.

111.    One representative email, sent to investors at 7:01 p.m. on September 15, attached

a copy of "The Reserve *Insights*" and stated as follows:

> Due to the unprecedented stress in the market (characterized by Alan
> Greenspan as a 'once in century event') and based on our client
> conversations and feedback during the day, I want to pass along the
> attached document to you (if you have not received already).  We
> currently have a 1.2% exposure to Lehman in Primary Fund — as you will
> note:
>
> > The Reserve is committed to a $1.00 NAV for its Primary Fund.
> > Reserve Management Company, Inc. (RMCI) intends to enter into
> > support agreements with the Primary Fund to support the value of
> > Lehman credit held in the Fund.  RMCI is the investment adviser
> > to the Fund and has provided investment advice to investment
> > companies within The Reserve family of funds since
> > November 15, 1971.  We have discussed with the SEC that our
> > intent is to mitigate any decline in the value of the Lehman debt so
> > that it will not result in a decrease to the NAV of the Fund.  We are
> > submitting appropriate documentation to the SEC today,
> > September 15, 2008.

112.    On September 15, RMCI personnel also emailed copies of "The Reserve *Insights*"

to personnel at Standard & Poor's and Moody's to falsely assure them that RMCI was committed

to protecting the $1.00 NAV of the Primary Fund, such that Moody's and Standard & Poor's

would refrain from a ratings downgrade.

113.    At approximately 5:00 p.m. on September 15, RMCI's CIO informed Bent Sr. via

telephone that he believed the rating agencies would be "fat and happy" after having received the

affirmative message of credit support for the Fund set forth in "The Reserve *Insights*."

114.    Although both Moody's and Standard & Poor's informed RMCI that they wanted

additional information about the credit support agreements – including copies of the actual

agreements – RMCI's decision to provide them with the affirmative manifestations of support in

"The Reserve *Insights*" was instrumental in delaying any adverse ratings action on September 15

or September 16 before the Fund disclosed it had broken the buck.

115.    Although RMCI's counsel had prepared and virtually finalized all of the draft documentation necessary to implement a credit support agreement for the Primary Fund by 4:00 p.m. on September 15, the Bents never asked even to review or execute the documents.

116.    Moreover, even though RMCI and the Bents had told the Fund's Board at 1:00 p.m. that entering into a credit support agreement was an urgent priority, and that RMCI would immediately seek relief from the Commission staff as part of the process, RMCI never submitted any draft documentation to the staff for review. To the contrary, RMCI's and the Bents' only objective with respect to a credit support agreement was to reap the hoped for benefits of telling the public that such an agreement existed.

## RMCI Misleads Shareholders and Moody's Concerning The Status of Redemptions

117.    In addition to falsely representing the existence of unqualified credit support for the Primary Fund, RMCI provided investors with materially false information about the Primary Fund's ability to satisfy redemption requests.

118.    On September 14, 2008, RMCI had anticipated that redemption levels on September 15 would likely exceed State Street's customary level of overdraft privileges. By approximately 1:50 p.m. on September 15, senior RMCI personnel, including the Chief Financial Officer and CIO, had acknowledged that State Street's suspension of overdraft privileges (which occurred at approximately 10:10 a.m.) was the "the kiss of death" for the Primary Fund, and that the Fund was "screwed" unless "something magical happens." The Board of Trustees was not, however, informed of these developments, or management's  assessment of the situation.

119.    Despite knowing that the Fund's inability to generate liquidity on September 15 to

that the Primary Fund was not experiencing any liquidity problems and that any delay in transmitting money was caused by operational or technical delays at State Street.

120.    RMCI also falsely informed Moody's at approximately 2:30 p.m. on September 15 that redemptions appeared to have "stopped" and that the Reserve had been able to generate sufficient liquidity by "selling product on the street" to fund all outstanding redemption requests.  RMCI personnel were aware, however, that redemptions had not stopped, that billions of dollars of shareholder redemptions remained unfunded, and that RMCI had been able to sell only a very small amount of assets to generate marginal amounts of liquidity.

121.    Later in the afternoon, Bent II reiterated to Moody's that RMCI had paid all outstanding redemptions through liquidity in the Fund, thus reassuring Moody's that the Primary Fund remained viable and liquid.  Bent II's representation was, however, false, as evidenced by RMCI's and Bent II's unsuccessful efforts in the hours before Bent II spoke with Moody's to obtain liquidity from third parties to satisfy billions of dollars of unpaid redemptions.

122.    Unbeknownst to the public, the Board and the rating agencies – which had been falsely assured that the situation at the Primary Fund was under control – Bent II had *already* concluded as early as midday on September 15 that RMCI should pursue an immediate sale of RMCI and the Reserve Funds to a third party, and had retained two investment banks to search for a buyer or partner.

123.    Bent II also failed to disclose that he had instructed the investment banks on the morning of September 16 to inform potential buyers that they would not be required to protect the $1.00 NAV of the Primary Fund, which directly contradicted Defendants' public assurances that they would protect the $1.00 NAV.

**RMCI Continues To Deceive Investors During the Evening of September 15**

124.    By approximately 5:00 p.m. on September 15, redemption requests had climbed to over $20 billion, nearly half of which were unfunded.  RMCI had also failed in its efforts to persuade State Street, or any other third parties, to provide it with additional liquidity to meet the large and growing backlog of investor redemptions.

125.    Despite knowledge of these facts, as part of a last-ditch effort to salvage the Primary Fund's viability as a money market fund, Bent II continued to authorize false statements by RMCI during the evening of September 15 to reassure investors that RMCI would support the $1.00 NAV of the Primary Fund.

126.    At 5:46 p.m. on September 15, Bent II authorized RMCI marketing personnel to communicate to the *Wall Street Journal* that "[i]f needed, The Reserve intends to protect the NAV on the funds to whatever degree is required, however this protection has not been needed."  In addition to authorizing the false statement that RMCI intended to provide an unlimited degree of support to the Primary Fund, the statement falsely suggested that no "protection" had been needed for any Reserve Fund holding Lehman debt when in fact both the Yield Plus Fund and International Liquidity Fund had *already* broken the buck earlier in the day and had thereafter been propped up by the recording of receivables.

127.    At 7:34 p.m., Bent II received an email from RMCI's Director of Sales, which indicated that RMCI's and the Bents' plan to slow redemption activity by convincing investors that the Primary Fund's NAV was safe had been successful.  The Director of Sales wrote: "[at approximately midday, the Reserve (via RMCI) established a posture that it would 'protect' the NAV of the primary fund.  The client base reacted positively to this news and the redemption activity slowed greatly."

128.    Bent II did not question the accuracy of the message the sales team had communicated to the public, which had been authorized by his 1:19 Email.  Nor did he instruct the sales team to alter the message going forward in light of the alarming redemption levels and State Street's unwillingness to provide additional liquidity.  Instead, at 9:47 p.m., he responded: "that's a nice summary, thank you very much."

129.    At approximately 9:36 p.m. on September 15, RMCI posted the materially false "The Reserve *Insights*" publication to its website to further disseminate word of the false plans to support the $1.00 NAV of the Primary Fund.

130.    RMCI's misrepresentations continued on September 16 when RMCI's Director of Marketing emailed a copy of "The Reserve *Insights*" to a contact at Crane Data, a web site covering developments in the money market industry.  Shortly thereafter, Crane Data published a news article on the impact of Lehman's bankruptcy on money market funds.  The article noted that "Reserve Primary" was "expected to protect their funds from any threat to the $1.00 a share NAV should it become necessary."

**RMCI Failed To Timely Disclose That The Primary Fund Had Broken The Buck**

131.    After adjourning shortly after 1:00 p.m. on September 15, the Board of Trustees did not meet again until approximately 10:00 a.m. on September 16.  By this point on September 16, the Fund was about to strike its third hourly NAV of the day on the basis of wholly inaccurate and incomplete information.

132.    At the outset of the 10:00 a.m. meeting, Bent II revealed to the Board that RMCI had not, contrary to its representations on September 15, entered into a credit support agreement to protect the $1.00 NAV of the Primary Fund.

133.    Bent II also disclosed that the level of redemption requests as of 9:00 a.m. on September 16 was approximately $24.6 billion, but that the Primary Fund had only been able to

generate liquidity to pay approximately the first $10.7 billion of those requests.  Bent II also

revealed for the first time that State Street had refused to extend additional overdraft privileges to

RMCI and the Reserve Fund, even though RMCI had been aware of that fact since early the day

before.

134.    The Trustees ended the Board meeting and convened an Executive Session to

assess the ramifications of what Bent II had disclosed.  According to the minutes of that session:

> Initially, the Independent Trustees indicated how shocked they
> were by the information relayed to them by Reserve Management
> during the morning's earlier call.  The Trustees noted that at
> 1:30 p.m. meeting yesterday Management had indicated that
> redemptions were approximately $5 billion and that Management
> intended to enter into a capital support agreement to support the
> $1.00 NAV.  Moreover, in response to a direct question from
> counsel to the Independent Trustees regarding whether
> Management had sufficient capital to support a $1.00 NAV,
> Management assured the Trustees they did.  The Trustees further
> indicated that no indication had been given prior to this morning's
> call that redemptions had mushroomed to $20 billion and that there
> was essentially a run on the funds.

135.    Based on the valuation of the Lehman debt at $0.80 and the redemption figures

available to RMCI, the Primary Fund's NAV declined below .995 at some point prior to

11:00 a.m. on September 16.  The Board was not informed of the actual state of affairs during

the morning of September 16.

136.    As RMCI conceded months later in a press release issued on November 26, 2008,

"contrary to previous statements to the public and to investors, the [Primary] Fund's net asset

value per share was $0.99 from 11:00 a.m. Eastern time to 4:00 p.m. Eastern time on

September 16, 2008 and *not* $1.00." According to RMCI, the failure to accurately determine

when the Primary Fund broke the buck was caused by "administrative error."

137.    On September 16 at approximately 4:00 p.m., wholly unaware that the Fund had

actually broken the buck at a minimum several hours earlier, RMCI issued a press release

announcing that the "value of the debt securities issued by Lehman Brothers Holdings, Inc. ...

and held by the Primary Fund has been valued at zero effective 4:00PM New York time today.

As a result, the NAV of the Primary Fund, effective as of 4:00PM, is $0.97 per share."

138.    Around the same time that RMCI announced that its flagship fund had broken the

buck – thus giving the Bents little incentive to protect the reputation and viability of other

Reserve funds – Bent II instructed RMCI's Director of Fund Accounting to reverse the

receivables that had been secretly recorded the day before to maintain the $1.00 NAV of the

Yield Plus Fund and International Liquidity Fund.  At the time they were reversed, the

receivables totaled approximately $17 million that was owed by RMCI, and ultimately, the

Bents.

**The Trustee's Decision to Liquidate the Primary Fund And Withhold $3.5 Billion**

139.    On September 29, 2008, RMCI disclosed that the Primary Fund's Board of

Trustees had voted to liquidate the Fund and distribute its assets to shareholders.  The press

release stated that an initial distribution of $20 billion would be made on a *pro rata* basis, and the

Fund and the Board were developing a plan for distributing the remainder of the Fund's assets.

140.    On December 3, 2008, RMCI disclosed the terms of a "Plan of Liquidation and

Distribution of Assets" for the Fund.  The Plan provided for further interim distributions of Fund

assets to shareholders on a *pro rata* basis up to the point of a "special reserve," which would be

calculated at a later date and "would include amounts that would be required to satisfy disputed

claims."

141.    On December 24, 2008, RMCI disclosed that the Fund's Board was still in the

process of evaluating the appropriate size of the special reserve.

142.    On February 26, 2009, RMCI announced that the Board had determined to

withhold from distribution a $3.5 billion "Special Reserve" that would, among other things, be

used to satisfy any damages claims brought by shareholders seeking to have their shares redeemed at the highest possible NAV per share.  The February 26 press release further stated that *pro rata* distributions would continue up until the amount of the Special Reserve.

143.    The SEC initiated an action against Defendants on May 5, 2009 to compel the distribution of all remaining Primary Fund assets on a *pro rata* basis.

144.    On November 25, 2009, this Court issued an Order enjoining the Primary Fund's liquidation plan and ordering that the Fund's remaining assets be liquidated and distributed on a *pro rata* basis to all Primary Fund shareholders who had not yet received $1.00 per share owned on or after September 15, 2008.

145.    However, the Order required that an Expense Fund, in the amount of $83.5 million, be created from the Fund's assets to cover indemnification expenses and management fees and expenses.  The November 25 Order also permanently enjoined any action or proceeding of any kind from being asserted against the Primary Fund or any of its potential indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund.

146.    According to the Primary Fund's Declaration of Trust, non-indemnifiable conduct is defined as conduct committed with "willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of the office in question."

147.    Defendants filed a letter dated January 29, 2010 with this Court on February 1, 2010, stating that $3.4 billion of the remaining $3.56 billion of Primary Fund assets had been distributed to the Fund's shareholders.  Approximately $160 million remains in the Fund to cover certain claims for indemnification expenses, management fees and other costs as approved by this Court.

148.    Following the various distributions of Fund assets that have been made, including the *pro rata* distribution on or about January 29, 2010, Plaintiffs have yet to recover approximately $20 million of Fund investments to which they are entitled.

149.    These damages are the direct result of the Defendants' wrongful conduct alleged herein.  Defendants misrepresented that the Primary Fund was a safe, conservative, and "boring" money market fund that was focused on liquidity, the preservation of capital, and the maintenance of a $1.00 NAV.  Additionally, Defendants repeatedly misled investors about the Primary Fund's liquidity, the causes for delays in redemptions, and the existence of credit support agreements to bolster the $1.00 NAV.

150.    As a direct result of the decision to forego conservative investments and instead invest in riskier commercial paper, the Primary Fund's NAV fell below $1.00 per share.  Defendants' misstatements also caused Plaintiffs to delay redeeming their shares.  As such, Defendant's misrepresentations and omissions directly caused Plaintiffs to suffer material losses.

151.    Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Primary Fund shares was efficient and well-developed and promptly digested current information from all publicly available sources and reflected such information in the market for these securities.  The false and misleading statements detailed above were disseminated into the marketplace and were reflected in the total mix of information about the Primary Fund known to investors.  The Reserve's money market funds and its flagship Primary Fund were consistently followed by the media.  As such, Plaintiffs did rely and are entitled to have relied upon the integrity of the market for Primary Fund shares and to a presumption of reliance on Defendants' materially false and misleading statements and omissions.

## CLAIMS FOR RELIEF

152.    In the Counts set forth below, Plaintiffs do not assert any claims against any of the

Primary Fund's Indemnitees that seek an award that would be payable or subject to

indemnification by the Primary Fund.  To the extent that the burden of proof or standard of

liability for any claim asserted below would otherwise make the claim one that is seeking an

award that would be payable or subject to indemnification by the Primary Fund, Plaintiffs

expressly disclaim that burden of proof and/or standard of liability and expressly assume a higher

burden of proof or standard of liability as necessary to make the claim non-indemnifiable.

### Count I

**Violations of and Aiding and Abetting Violations of Section 10(b) of the
Exchange Act and Rule 10b-5 Thereunder Against All Defendants**

153.    Paragraphs 1 through 151 are re-alleged and incorporated by reference as if fully

set forth herein.

154.    Defendants, directly or indirectly, singly or in concert, by use of the means or

instrumentalities of interstate commerce, or by the use of the mails, or of the facilities of a

national securities exchange, in connection with the purchase or sale of securities, knowingly or

recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue

statements of material facts and omitted to state material facts necessary in order to make

statements made, in the light of the circumstances under which they were made, not misleading;

and/or (c) engaged in acts, practices and courses of business which operated or would have

operated as a fraud or deceit upon purchasers of securities and upon other persons.

155.    Defendants' untrue and/or misleading statements and omissions were intended to

and did: (i) deceive the investing public, including Plaintiffs, regarding the Primary Fund's

compliance with its stated investment objectives and policies; and (ii) cause Plaintiffs to

purchase Primary Fund shares that were impaired by concealed and unreasonable risks for loss for this type of investment.

156.    Throughout the course of Plaintiffs' investments in the Primary Fund, Defendants caused the Primary Fund to deviate from its stated policy by making significant investments in securities, such as the Lehman Brothers commercial paper, that produced higher yields but posed greater risk to capital preservation and liquidity.  These investments in riskier securities, in the aggregate, increased the Primary Fund's yield and benefited Defendants by attracting more capital into the Primary Fund and thereby increasing Defendants' management fees and other fees.  Defendants misled investors by failing to disclose the riskier nature of the Primary Fund's aggregate investments.

157.    Plaintiffs' investments in the Primary Fund lost value as a result of Defendants' fraudulent course of conduct.  Plaintiffs reviewed and relied on these and other statements made by Defendants.  In addition, these statements were disseminated into the marketplace and were reflected in the total mix of information about the Primary Fund known to investors.

158.    Plaintiffs suffered damages in that they did not purchase a true money market fund, or even a cash fund managed to preserve capital, but a much riskier fund.  As a result of that added risk, the Primary Fund value declined below $1.00 NAV, causing Plaintiffs' losses.

159.    RMCI, Resrv Partners and the Bent Defendants acted with scienter in that they knew that their fraudulent scheme to defraud Primary Fund investors would be communicated to and relied upon by the investing public, or they acted with reckless disregard in that they failed to ascertain that their pervasive scheme would be communicated to and relied upon by the investing public, as primary violations of the securities laws.  As detailed above, the scienter of these Defendants includes (but is not limited to) allegations demonstrating that:

a.   Defendants knowingly and/or recklessly misled investors as to the nature of the Primary Fund's investment objective that caused the Primary Fund to invest in risky commercial paper, such as the Lehman Brothers debt;

b.   Defendants were knowingly and/or recklessly motivated to invest in risky commercial paper in order to attract capital, increase significantly Defendants' management and distribution fees, and to entice potential buyers;

c.   Defendants knowingly and/or recklessly misled investors by ignoring and/or downplaying the risks that the Primary Fund's stake in Lehman Brothers posed to the health of the Primary Fund and its maintenance of a $1.00 NAV;

d.   Defendants knowingly and/or recklessly misled investors by making knowingly false and misleading statements that RMCI and/or the Bents were going to maintain the $1.00 NAV by entering into a credit support agreement or arranging for a third party letter of credit in the months leading up to the Lehman Brothers bankruptcy up to and including September 15 and September 16, in order to persuade investors not to file redemption requests and to invest in the Primary Fund;

e.   Defendants knowingly and/or recklessly misled investors by knowingly or recklessly failing to assign a fair market value to the Lehman Brothers debt on September 15 in order to discourage investors from seeking redemptions and to prevent the Primary Fund from "breaking the buck;"

f.   Defendants knowingly and/or recklessly misled investors by wrongfully prioritizing certain redemption requests and making selective disclosures to certain investors, in violation of the Primary Fund's Prospectus and policies; and

g.   Defendants knowingly and/or recklessly misled investors by providing false information as to the amount of redemption requests, the status of those redemption requests and the reason for the Primary Fund's inability to honor most redemption requests.

160.   By reason of the foregoing, the Defendants, singly or in concert, directly or indirectly, have violated,  Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240./Ob-5].

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Bent Defendants

161.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

162.     This Count is asserted against the Bent Defendants for violations of Section 20(a) of the Exchange Act.

163.     Because this Action does not assert any claim against any of the Primary Fund's "Indemnitees" that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Plaintiffs assert this Count against Defendants based solely on their culpable participation in the violations of Section 10(b) alleged above, which constitutes at least willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations, as well as their positions of control and authority over the primary violators.

164.     Each of the Bent Defendants was a control person of the Reserve Fund, RMCI, and Resrv Partners by virtue of his position as a senior officer of those Defendants.  The Bent Defendants each had a series of direct and/or indirect business and/or personal relationships with trustees and/or officers and/or major shareholders of the Reserve Fund and the Primary Fund.  In addition, the Bent Defendants are considered "controlling persons" of RMCI, and Resrv Partners based on their direct and indirect securities ownership.

165.     The Bent Defendants are "control persons" within the meaning of Section 20(a) of the Exchange Act.  Because of their positions of control, these Defendants were able to, and did, directly or indirectly, control the conduct of the persons directly liable for primary violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, promulgated thereunder.

166.     At the time the Bent Defendants had the power to control or influence the particular transactions, statements, omissions and/or conduct giving rise to the primary violations of Section 10(b) and Rule 10b-5, as alleged herein, they exercised that power.  The Bent Defendants either directly or indirectly induced the primary violations of law complained of herein.

## COUNT III

### Violations of Section 11 of the Securities Act Against All Defendants

167.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

168.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against RMCI, Resrv Partners, and the Bent Defendants.  Because this Action does not assert any claim against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Plaintiffs assert this Count against Defendants based on their actions which at least constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

169.     Shares of the Primary Fund were sold pursuant to a Registration Statement, a Prospectus and a Statement of Additional Information all filed by the Defendants with the SEC in 2006 and 2007.

170.     The Prospectus contains untrue statements of material facts, including, but not limited to, materially inaccurate, false and misleading statements, and omissions of fact necessary to make the statements made not misleading and/or required to be stated therein, about, *inter alia,* the Primary Fund's investment objectives and fundamental investment policies.

The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

171.    The Registration Statement also contains untrue statements of material facts, including, but not limited to, materially, inaccurate, false and misleading descriptions of the Defendants' policies regarding selective disclosure of non-public information regarding the Primary Fund's portfolio holdings. This includes an assurance that the Trust and its agents "do not expect to disclose information about portfolio holdings that is not publicly available to individual and institutional investors, to intermediaries that distribute the Funds' shares or to any other third party." Nowhere did the Registration Statement disclose that institutional investors would receive selective disclosures concerning how the Fund's portfolio holdings were being valued, as occurred on September 15, 2008.

172.    The Registration Statement also set forth share redemption procedures that in no way resembled the actions taken by the Trust and its agents on September 15, 2008, and nowhere disclosed to shareholders that certain institutional investors would receive selective disclosures regarding difficulties in the Primary Fund long before others did, nor that certain redemption requests would be prioritized over others.

173.    The Reserve Fund is the registrant of the Prospectus. The Defendants named herein were responsible for the contents and dissemination of the Prospectuses. RMCI is the *de facto* issuer of the shares of the Primary Fund, and is liable to the Plaintiffs for the misstatements and omissions. Resrv Partners is the underwriter of the shares of the Primary Fund. The Bent Defendants are the Officers of RMCI and Directors of Resrv Partners, and signed the Prospectuses. Each of the Bent Defendants was responsible for the contents and dissemination of the Prospectuses.

174.    Each of the Defendants named herein acted with gross negligence, willful misfeasance, bad faith and/or reckless disregard of their obligations and/or duties to the Primary Fund in failing to make a reasonable investigation of the statements contained in the Prospectuses, and did not possess reasonable grounds for the belief that the Prospectuses did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

175.    Plaintiffs did not know, nor in the exercise of reasonable diligence, could they have known, of the untrue statements of material facts or omissions of material facts in the Prospectuses when they purchased the Primary Fund shares.

176.    By reason of the conduct alleged herein, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

177.    Plaintiffs have sustained damages.  The value of the Primary Fund's shares declined subsequent to and due to Defendants' violations.

178.    By reason of the foregoing, the Defendants are liable to the Plaintiffs for violations of Section 11 of the Securities Act.

## COUNT IV

### Violations of Section 12(a)(2) of the Securities Act Against All Defendants

179.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

180.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act against RMCI, Resrv Partners, and the Bent Defendants.  Because this Action does not assert any claim against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Plaintiffs

assert this Count against Defendants based on their actions which at least constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

181.    The Prospectuses contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

182.    Defendants were sellers and offerors and/or solicitors of purchasers of the shares offered pursuant to and/or traceable to the Prospectuses.  Their actions of solicitation included preparation and distribution of the false and misleading Prospectuses and participating in road shows to market the Primary Fund to investors.  Resrv Partners, as the distributor of the shares in the Primary Fund, acted as an underwriter.

183.    Defendants owed Plaintiffs, as purchasers of the Primary Fund shares, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements therein not misleading. Defendants acted with gross negligence, willful misfeasance, bad faith and/or reckless disregard of their obligations and/or duties, in failing to exercise the reasonable care required for them to have known of the misstatements and omissions contained in the Prospectus as set forth above.

184.    Plaintiffs purchased or otherwise acquired Primary Fund shares pursuant to and/or traceable to the Prospectus.  By reason of the conduct alleged herein, Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs hereby tender their shares in the Primary Fund to Defendants and seek rescission of their purchases to the extent that they continue to own such securities.

185.     Plaintiffs did not know, nor in the exercise of reasonable diligence, could they have known, of the untrue statements of material facts or omissions of material facts in the Prospectuses when they purchased the Primary Fund shares.

186.     Plaintiffs suffered injury as a result of Defendants' actions in violation of Section 12(a)(2).  The value of the Primary Fund's shares declined subsequent to and due to Defendants' violations.

187.     By reason of the foregoing, the Defendants are liable to Plaintiffs for violations of Section 12(a)(2) of the Securities Act.

## COUNT V

### Violations of Section 15 of the Securities Act Against the Bent Defendants

188.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

189.     This Count is brought pursuant to Section 15 of the Securities Act against the Bent Defendants.  Because this Action does not assert any claim against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Plaintiffs assert this Count against Defendants based on their actions which at least constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

190.     Each of the Bent Defendants was a control person of the Reserve Fund, RMCI, and Resrv Partners by virtue of his position as a senior officer of all of the Reserve entities.  The Bent Defendants each had a series of direct and/or indirect business and/or personal relationships with trustees and/or officers and/or major shareholders of the Reserve Fund and the Primary

Fund.  In addition, the Bent Defendants are considered "controlling persons" of RMCI and Resrv Partners based on their direct and indirect securities ownership.

191.    The Bent Defendants are "control persons" within the meaning of Section 15 of the Securities Act.

192.    The Bent Defendants were culpable participants in the violations of Sections 11 and 12 of the Securities Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statements, having sold or offered for sale shares of the Primary Fund, having caused distribution of the Prospectus materials, and/or having otherwise participated in the process which allowed the sales of the Primary Fund shares to be successfully completed.

193.    The Bent Defendants knew or had reason to know that the facts alleged herein giving rise to liability of the persons they controlled.

## COUNT VI

### Claim for Breach of Fiduciary Duty And/Or Aiding and Abetting
### Breach of Fiduciary Duty Against All Defendants

194.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

195.    Because this Action does not assert any claim against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Plaintiffs assert this Count against Defendants based on their actions which at least constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

196.    Defendants have violated their fiduciary duties of care, loyalty, good faith and independence owed to Plaintiffs and other Primary Fund shareholders, and have acted to put

their personal interests ahead of the interests of the Primary Fund's shareholders, and/or have aided and abetted other Defendants therein.

197.    Defendants breached their fiduciary duties by, but not limited to:

a.      Failing to properly preserve the assets of the Primary Fund;

b.      Failing to invest the assets in a way consistent with the Primary Fund's investment objective;

c.      Acting in their own self-interest to the detriment of the Primary Fund shareholders, including Plaintiffs;

d.      Making selective disclosures to certain investors; and

e.      Prioritizing certain redemptions requests over those of other investors.

198.    As a result of the actions of Defendants, Plaintiffs have been irreparably damaged in that they have not and will not receive their fair portion of the value of the Primary Fund's assets.

## COUNT VII

### Claim for Fraud Against All Defendants

199.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

200.    The allegations set forth above demonstrate that the Defendants knowingly or recklessly made, or caused to be made, numerous false and/or misleading statements and omissions regarding Plaintiffs' investments in the Primary Fund.

201.    These false and/or misleading statements and omissions include, but are not limited to:

a.      Misrepresenting that the Primary Fund was a safe, stable, and highly liquid investment despite the fact that Defendants had caused the Primary Fund to increase its exposure to riskier investments and become more vulnerable to credit and liquidity risks; and

b.    Discouraging Primary Fund investors such as Plaintiffs from submitting redemption requests by setting an artificially inflated valuation for the Lehman Brothers debt; by falsely stating the reason for the Primary Fund's inability to honor most redemption requests; and by stating that the Reserve would provide credit support to protect a $1.00 NAV.

202.    Defendants either knew, or were reckless in not knowing, that the statements and omissions were false and misleading when made.

203.    Plaintiffs reasonably and justifiably relied upon these materially false and misleading statements and omissions in investing in and remaining in the Primary Fund.

204.    As a result of the actions of Defendants, Plaintiffs have been irreparably damaged in that they have not and will not receive their fair portion of the value of the Primary Fund's assets.

## COUNT VIII

### Claim for Gross Negligence Against All Defendants

205.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

206.    For the reasons detailed above, Defendants were grossly negligent in failing to exercise reasonable care, and breached their duties of loyalty, good faith, and independence, and/or aided and abetted other Defendants therein.  Moreover, Defendants failed to properly preserve the assets of the Primary Fund and failed to invest the assets in a manner that met with the Primary Fund's investment objective.

## COUNT IX

### Violation of Minnesota Consumer Fraud Act, M.S.A. § 325F.69

207.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

208.     Because this Action does not assert any claim against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Plaintiffs assert this Count against Defendants based on their actions which at least constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

209.     Defendants engaged in deceptive practices in violation of the Minnesota Consumer Fraud Act ("MCFA") by failing to provide Plaintiffs with the information it had provided other investors.  For example, Defendants told, or caused to be told, some investors, but not others, (1) that the Primary Fund might break the buck on Monday, September 15, 2008; and (2) that there was significant redemption activity on Monday, September 15, 2008.

210.     Defendants also engaged in deceptive practices in violation of the MCFA by prioritizing certain redemptions over redemptions received earlier in the day.

211.     Defendants' deceptive practices caused Plaintiffs' damages.  As a result of the actions of Defendants, Plaintiffs have been irreparably damaged in that they have not and will not receive their fair portion of the value of the Primary Fund's assets.

## COUNT X

**Violation of Minnesota False Statement in Advertising Act, M.S.A. § 325F.67**

212.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

213.     Because this Action does not assert any claim against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Plaintiffs assert this Count against

Defendants based on their actions which at least constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

214. Defendants disseminated untrue, deceptive, and/or misleading claims in their Prospectuses, Registration Statement, and other public statements regarding (1) their investment strategy; (2) the method in which information is disseminated to shareholders; and (3) the methods by which redemption requests would be handled.

215. The actions taken by Defendants on September 15 and 16, 2008, as detailed above, show that these claims were untrue, deceptive, and/or misleading.

216. Defendants' Prospectuses, Registration Statement, and other public statements thus constitute false statements in advertising in violation of the Minnesota False Statement in Advertising Act ("MFSAA").

217. Defendants' false statements caused Plaintiffs' damages. As a result of the actions of Defendants, Plaintiffs have been irreparably damaged in that they have not and will not receive their fair portion of the value of the Primary Fund's assets.

## JURY DEMAND

218. Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

219. WHEREFORE, plaintiffs hereby pray for the following relief:

    A. Compensatory damages awarded to plaintiffs against all Defendants sustained as a result of Defendants' violations, together with interest on those damages;

    B. Rescission and/or rescissory damages awarded to plaintiffs;

C.  Prejudgment interest and/or opportunity cost damages awarded to
   Plaintiffs;

D.  Punitive damages to the extent permitted by law awarded to Plaintiffs;

E.  A constructive trust to withhold all "accrued" but not paid management
   fees or expenses Defendants claim they are entitled to from the Primary
   Fund;

F.  Such other and further relief as to the Court shall deem proper.

Dated:  March 26, 2010                Respectfully submitted,

                                      AMERIPRISE FINANCIAL, INC. and
                                      SECURITIES AMERICA, INC.


                                      _____
                                      Harvey J. Wolkoff
                                      Robert A. Skinner
                                      Ropes & Gray LLP
                                      One International Place
                                      Boston, MA  02110
                                      (617) 951-7000

**Certificate of Service**

I hereby certify that on this 26th day of March, 2010, I caused true and correct copies of this Second Amended Complaint to be served by e-mail and overnight courier on all counsel of record in this action.

_____
Robert A. Skinner