## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | MDL No. 09-md-2011 (PGG) |
| AMERIPRISE FINANCIAL SERVICES, INC. and SECURITIES AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR. BRUCE BENT II, and ARTHUR T. BENT, <br><br> Defendants. | No. 09-cv-1288 (PGG) |

## AMERIPRISE'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO
## DISMISS THE SECOND AMENDED COMPLAINT

## TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Ali v. Francois*,
   No. CT 02-002459, 2003 WL 23515768 (Minn. Dist. Ct. Nov. 5, 2003) ...............................26

*AngioDynamics, Inc. v. Biolitec, Inc.*,
   606 F. Supp. 2d 300 (N.D.N.Y. 2009) ...................................................................................17

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ...............................................................................................................13

*Blasberg v. Oxbow Power Corp.*,
   934 F. Supp. 21 (D. Mass. 1996) ...........................................................................................24

*Church of the Nativity of Our Lord v. Watpro*,
   491 N.W.2d 1 (Minn. 1992), overruled on other grounds by *Ly*, 612 N.W.2d ....................27

*Collins v. Minnesota School of Business Incorporated*,
   655 N.W.2d 320 (Minn. 2003) ...............................................................................................26

*Cromer Fin. Ltd. v. Berger*,
   205 F.R.D. 113 (S.D.N.Y. 2001) ...........................................................................................14

*Diamond v. Pappathanasi*,
   No. SUCV2007-4117BLS1, 2009 WL 1539792 (Mass. Sup. June 3, 2009) .........................24

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) .................................................................................................6, 7

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008) ..............................................................................15, 19

*Griffin v. PaineWebber Inc.*,
   84 F. Supp. 2d 508 (S.D.N.Y. 2000) ......................................................................................18

*Heller v. Goldin Restructuring Fund, L.P.*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008) ....................................................................................12

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) .........................................................................................................15, 16

*Hurley v. FDIC*,
    719 F. Supp. 27 (D. Mass. 1989) ...........................................................................24

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
    93 F. Supp. 2d 424 (S.D.N.Y. 2000)......................................................................18

*In re Centerline Holding Co. Sec. Litig.*,
    No. 09-3744-cv, 2010 WL 2303312 (2d Cir. June 9, 2010) ...................................6

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009)....................................................................16

*In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*,
    No. 03 Civ. 8208, 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006)............................15

*In re Worldcom, Inc. Securities Litigation*,
    308 F. Supp. 2d 236 (S.D.N.Y. 2004)....................................................................20

*In re WRT Energy Sec. Litig.*,
    No. 96 Civ. 3610, 2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005) ....................15, 16

*Indep. Glass Ass'n. v. Safelite Grp., Inc.*,
    No. 05-238, 2005 WL 2093035 (D. Minn. Aug. 26, 2005)....................................26

*La Parilla, Inc. v. Jones Lang Lasalle Am., Inc.*,
    No. 04-4080, 2006 WL 2069207 (D. Minn. July 26, 2006) ..................................28

*LaSala v. Bordier et Cie*,
    519 F.3d 121 (3d Cir. 2008)..................................................................................22

*LaSala v. TSB Bank, PLC*,
    514 F. Supp. 2d 447 (S.D.N.Y. 2007)....................................................................22

*LeSage v. Norwest Bank Calhoun-Isles, N.A.*,
    409 N.W.2d 536 (Minn. Ct. App. 1987) ...............................................................28

*Ly v. Nystrom*,
    615 N.W.2d 302 (Minn. 2000).................................................................25, 26, 27

*Norman v. Salomon Smith Barney, Inc.*,
    350 F. Supp. 2d 382 (S.D.N.Y. 2004)....................................................................23

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)......................................................................................7

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010)..................................................................................18

*Paru v. Mut. of Am. Life Ins. Co.*,
  No. 04 Civ. 6907, 2006 WL 1292828 (S.D.N.Y. May 11, 2006)............................................23

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*,
  446 F. Supp. 2d 163 (S.D.N.Y. 2006)...............................................................................12

*Rescuecom Corp. v. Google Inc.*,
  562 F.3d 123 (2d Cir. 2009)................................................................................................6

*RGH Liquidating Trust v. Deloitte & Touche LLP*,
  891 N.Y.S.2d 324 (N.Y. App. Div. 2009) ...........................................................................22

*Rucki v. Grazzini*,
  27-CV-07-24406, 2010 WL 1286725 (Minn. App. Apr. 6, 2010) ..........................................22

*State by Humphrey v. Alpine Air Prod., Inc.*,
  490 N.W.2d 888 (Minn. Ct. App. 1992)..............................................................................27

*State by Humphrey v. Alpine Air Prod., Inc.*,
  500 N.W.2d 788 (Minn. 1993).............................................................................................29

*Stephenson v. Deutsche Bank AG*,
  282 F. Supp. 2d. 1032 (D. Minn. 2003)..............................................................................28

*Tannenbaum v. Zeller*,
  552 F.2d 402 (2d Cir. 1977).................................................................................................18

*Wiegand v. Walser Auto. Grps., Inc.*,
  683 N.W.2d 807 (Minn. 2004)..............................................................................................29

*Xpedior Creditor Trust v. Credit Suisse First Bos. (USA) Inc.*,
  399 F. Supp. 2d 375 (S.D.N.Y. 2005).................................................................................23


Sᴛᴀᴛᴜᴛᴇꜱ

15 U.S.C. § 78bb(f)(5)(D)......................................................................................................21

15 U.S.C. § 771(2) (1998) .....................................................................................................18

28 U.S.C. § 1407...................................................................................................................19

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

PROCEDURAL BACKGROUND.........................................................................3

ARGUMENT ........................................................................................................5

I.    THE COMPLAINT SUFFICIENTLY PLEADS A CAUSE OF ACTION UNDER SECTION 10(B) AND RULE 10B-5................................................................5

    A.    Defendants' Material Misstatements and Omissions Prior to September 15, 2008 ..7

        1.    The Complaint Adequately Pleads Pre-September 15th Actionable Misstatements and Omissions................................................7

        2.    The Complaint Adequately Pleads Pre- September 15th Scienter................11

    B.    The Complaint Adequately Pleads Reliance ..........................................12

    C.    Securities America Has Standing to Sue for Securities Fraud ................14

II.    THE COMPLAINT SUFFICIENTLY PLEADS A CAUSE OF ACTION UNDER SECTION 20(A) OF THE EXCHANGE ACT..................................................15

III.    THE COMPLAINT SUFFICIENTLY PLEADS A CAUSE OF ACTION UNDER SECTION 11 OF THE SECURITIES ACT .....................................................15

IV.    THE COMPLAINT SUFFICIENTLY PLEADS A CAUSE OF ACTION UNDER SECTION 12(A)(2) OF THE SECURITIES ACT ...........................................18

V.    THE COMPLAINT SUFFICIENTLY PLEADS A CAUSE OF ACTION UNDER SECTION 15 OF THE SECURITIES ACT ....................................................19

VI.    THE COMPLAINT SUFFICIENTLY PLEADS CAUSES OF ACTION FOR THE STATE LAW CLAIMS .................................................................................19

    A.    SLUSA Does Not Preempt Plaintiffs' State Law Claims......................19

        1.    This Case Does Not Qualify as a "Covered Class Action"...........19

        2.    Plaintiffs' State Law Claims for Breach of Fiduciary Duty and Gross Negligence are not preempted by SLUSA ....................................22

    B.    Plaintiffs' Claims for Breach of Fiduciary Duty and Gross Negligence are Direct Claims and Need Not Have Been Brought Derivatively .........................24

    C.    Plaintiffs Have Sufficiently Alleged Violations of the Minnesota Consumer Protection Statutes .................................................................................25

1.    Plaintiffs Have Standing to Sue Under the Minnesota Consumer Protection Statutes Because the Claims Will Yield a Public Benefit..............................25

2.    Plaintiffs Qualify as "Consumers" .................................................................27

3.    Plaintiffs Have Sufficiently Alleged Loss Causation for their MCFA and MFSAA Claims...............................................................................................28

4.    Plaintiffs Have Alleged Their MCFA and MFSAA Claims With Sufficient Particularity ...................................................................................................29

CONCLUSION....................................................................................................................29

Plaintiffs Ameriprise Financial Services, Inc. ("Ameriprise") and Securities America, Inc. ("Securities America") (collectively, "Plaintiffs") submit this memorandum of law in opposition to Defendants Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Inc. ("Resrv Partners"), Bruce Bent Sr., Bruce Bent II, and Arthur T. Bent's (collectively, "Defendants") Motion To Dismiss the Second Amended Complaint ("Complaint").

## PRELIMINARY STATEMENT

This litigation is nearly two years old, and substantial discovery by the Securities and Exchange Commission ("SEC") and motion practice have already established that Defendants engaged in the wrongdoing alleged in the Complaint – amply supporting Plaintiffs' claims.  On September 15 and 16, 2008, after the announcement of Lehman Brothers' bankruptcy, Defendants undertook a systematic campaign to deceive Plaintiffs and the investing public into believing that the Reserve Primary Fund ("Primary Fund" or "Fund") was safe, secure, and liquid despite its substantial Lehman holdings in risky commercial paper.  This followed years of assurances from Defendants that investing in the Primary Fund was very safe, notwithstanding that Defendants had shifted the Fund's strategy to riskier investments.  As discussed in the Court's November 25, 2009 Memorandum and Opinion (hereinafter, the "November 25 Order"),[1] the record in this case reflects a number of material misstatements and omissions by Defendants, including:

- Misrepresenting the amount of redemption requests to the Board of Independent Trustees ("Board"), which is responsible for setting the net asset value ("NAV") of the Primary Fund.  *See* Skinner Decl. Ex. H at 5 (finding "substantial evidence that the Trustees were told [at the 1:00 pm meeting on September 15] that redemption requests at that time totaled $8 billion" when the correct figure was actually $16.5 billion);

[1] A copy of this order is attached as Exhibit H to the Declaration of Robert A. Skinner dated August 6, 2010 ("Skinner Decl.").

- Failing to tell the Board that State Street, the Fund's custodian, had stopped funding redemption requests. *See id.* at 5-6 ("The minutes indicate that the Trustees were not told that State Street had stopped funding redemptions and had suspended the Fund's overdraft privileges, both of which had occurred some three hours earlier.");

- Misrepresenting to the Board that the Primary Fund would enter into a credit support agreement to preserve the $1.00 NAV. *See id.* at 6 ("The minutes further reflect that, under questioning by the Trustees, RMCI represented that sufficient capital would be made available to support the Primary Fund and preserve the $1.00 NAV."); and

- Misrepresenting to the public that the Primary Fund would enter into such a credit support agreement and that the Primary Fund was already in discussions with the SEC, to set up such an agreement. *See id.* at 6-7 ("During the afternoon of September 15, RMCI issued a press release . . . stat[ing] that RMCI 'intends to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund,' and that these 'support agreements ensure the integrity of a $1.00 NAV.' The release further states that RMCI has 'discussed with the SEC that our intent is to mitigate any decline in value of the Lehman debt so that it will not result in a decrease to the NAV of the Fund,' and that RMCI would submit 'appropriate documentation to the SEC today, September 15, 2008,' to put those support agreements in place.").

Not until September 16, 2008, however, did Defendants tell the Board the truth, namely that redemption requests were much higher than previously reported and that RMCI would not be able to provide the credit support necessary to preserve a $1.00 NAV, information that "shocked" the Independent Trustees. Skinner Decl. Ex. H at 7. The Court observed, "[a]s the chronology of events on September 15 and 16 makes clear . . . , there is abundant evidence that the Trustees – in setting NAVs on September 15 and 16 – relied on inaccurate or incomplete information about the value of the Lehman debt, the amount and timing of redemption requests, State Street's decision to halt redemptions and to suspend the Fund's overdraft privileges, and the ability of RMCI to obtain liquidity sufficient to preserve the Primary Fund's $1.00 NAV." *Id.* at 24-25 (emphasis added). Defendants compounded these problems by making a number of selective disclosures on September 15 of non-public material facts to their most important major institutional investors regarding the value and liquidity of the Fund. Second Amended Complaint ("SAC") ¶ 12. The consequence of Defendants' behavior was that "Primary Fund

investors deciding whether or not to redeem following the collapse of Lehman were unable to make informed decisions or operate on an equal playing field in light of the chaotic circumstances and the actions of Fund managers and salespeople." Skinner Decl. Ex. H at 21. As a result, investors such as Plaintiffs suffered major losses, because, *inter alia*, certain investors were allowed to redeem their shares at the inflated NAV of $1.00 – leaving Plaintiffs and others with shares worth considerably less than their true value.

Defendants are incorrect that these facts and others alleged in the Complaint are legally insufficient to support Plaintiffs' claims. Even putting aside the established existing record of Defendants' wrongful conduct, the allegations in the Complaint are more than adequate to withstand Defendants' motion to dismiss. Defendants' technical arguments as to why Plaintiffs' claims fail to satisfy applicable pleading standards are based on mischaracterizations of Plaintiffs' claims and overly narrow readings of the factual allegations. For the reasons set forth below, Defendants' motion should be denied.

## PROCEDURAL BACKGROUND

In their Motion, Defendants refer to the fact that Plaintiffs' claims have evolved over the course of the litigation, and that there are similarities between Plaintiffs' allegations and those of the SEC and Class Plaintiffs – suggesting that this somehow undermines the Complaint. *See* Memorandum of Law in Support of Defendant's Motion to Dismiss (hereinafter "Def. Mem.") at 3. But the eventual convergence of the allegations in the various complaints is nothing but the natural consequence of the procedural history of this case and Defendants' own efforts to cover up their misconduct. The Ameriprise Plaintiffs initiated their case in the U.S. District Court for the District of Minnesota on September 19, 2008, almost immediately after the Fund's collapse, seeking injunctive relief to halt the outflow of additional assets from the Fund. The allegations

in the original complaint were based upon the limited facts known to Plaintiffs at the time from their own dealings with Defendants:  in particular, that Defendants had selectively disclosed material information regarding the Fund's condition to certain major institutional investors, exacerbating the run on the Fund to the detriment of other investors.  Based on these allegations, the District of Minnesota entered a Temporary Restraining Order on September 19, 2008, barring further payment by the Fund of investor redemption requests.

The SEC then entered an administrative order on September 22, 2008, similarly barring further redemption payments from the Fund.  At Defendants' request, the District of Minnesota lifted its order on September 23, 2008 in light of the SEC's order, but at the same time ordered that Plaintiffs could immediately take limited discovery of Defendants regarding the allegations of selective disclosure.  Defendants vigorously opposed this expedited discovery, and repeatedly sought to strictly limit its scope.  On October 17, 2008, Defendants moved to dismiss Plaintiffs' original complaint.  In response, Plaintiffs filed their First Amended Complaint on October 23, 2008, supplementing their allegations with additional facts learned in the limited discovery allowed by the Minnesota court.  On February 10, 2009, before the Minnesota court ruled on Defendants' motion to dismiss, the Judicial Panel on Multi-District Litigation ordered, over Ameriprise's objection, that the Ameriprise action be transferred to this Court to become part of the present multidistrict litigation ("MDL").  Transfer to the MDL effectively halted the discovery in the Ameriprise action.

In the meantime, the SEC and other regulatory authorities were using their investigative authority and subpoena powers to obtain discovery regarding Defendants' mishandling of the Fund and the events of September 15 and 16, 2008.  The scope of these investigations was, of course, much broader than the discovery Plaintiffs were permitted to take (over Defendants'

-4-

vehement objections) in the Minnesota action prior to transfer.  The SEC's factual investigation resulted in its filing a complaint on May 5, 2009 and its motion to this Court for an order requiring the Fund's assets to be distributed on a *pro rata* basis in light of Defendants' serious misconduct.  The regulatory investigations brought to light extensive additional misconduct by Defendants that exceeded the scope of Plaintiffs' limited expedited discovery.  Following extensive briefing, the Court ultimately granted a modified version of the SEC's requested relief in its November 25 Order, a ruling that included significant factual findings based upon the information presented by the SEC's submissions.  In order to preserve the Fund's assets, the November 25 Order also barred claims against the Fund itself, as well as certain claims subject to indemnification by the Fund.  The Court denied Defendants' motion to dismiss the SEC's complaint on February 24, 2010.

Plaintiffs filed their present pleading, the Second Amended Complaint, on March 29, 2010.  This Complaint dropped those claims from prior iterations that were barred by the November 25 Order, and supplemented its factual allegations and legal claims based upon Defendants' misconduct brought further to light by the regulatory investigations and complaints. Defendants thus have no basis to criticize Plaintiffs for failing to assert all of their present allegations in the prior complaints filed in the immediate aftermath of the Fund's collapse.

## <u>ARGUMENT</u>

## I.    THE COMPLAINT SUFFICIENTLY PLEADS A CAUSE OF ACTION UNDER SECTION 10(B) AND RULE 10B-5

Defendants argue that Plaintiffs' claim under Section 10(b) and Rule 10b-5 does not satisfy the pleading requirements set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA") and fails to allege any actionable misstatements sufficient to state a claim.  *See* Def. Mem. at 5-6.  The pleading requirements under Rule 10b-5 and the PSLRA are well

established:  "the complaint must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading,' and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(1) and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007)).  The required state of mind (or scienter) "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.  Conscious misbehavior or recklessness can be shown by demonstrating "that defendants 'knew facts or had access to information suggesting that their public statements were not accurate.'"  *In re Centerline Holding Co. Sec. Litig.*, No. 09-3744-cv, 2010 WL 2303312 at *2 (2d Cir. June 9, 2010) (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).  When reviewing a motion to dismiss for failure to state a claim, "a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally."  *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009) (internal quotation omitted).[2]  Whether a misleading statement or omission is material for Section 10(b) purposes is "a mixed question of law and fact, and a complaint may not be dismissed under Rule 12(b)(6) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

---

[2]  Whether the Court applies the heightened pleading requirements under Fed. R. Civ. P. 9(b) is of no moment, as the allegations in the Complaint are more than adequate under this standard as well.

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d

Cir. 2010) (citing *ECA*, 553 F.3d at 197) (internal quotations omitted).

Notably, Defendants' arguments regarding the materially misleading statements and

scienter are limited to Plaintiffs' allegations regarding *pre-September 15* fraud.  The reason

Defendants chose not to dispute the post-September 15th allegations is apparent:  the Court's

prior rulings in the November 25 Order and its denial of the motion to dismiss the SEC's

similarly grounded complaint – holding that complaint adequately alleged actionable

misstatements and scienter – make abundantly clear that the record supports these elements of

Plaintiffs' fraud claims for the September 15-16 conduct.[3]  *See* Skinner Decl. Ex. I.  As discussed

in Point I.A below, the same holds true for Defendants' representations regarding the Fund prior

to September 15, 2008.  Moreover, Defendants' assertion that the Complaint fails to allege

reliance with respect to both pre- and post-September 15 conduct is equally unavailing, as

discussed in Point I.B.

     **A.**    **Defendants' Material Misstatements and Omissions Prior to
September 15, 2008**

         *1.*    *The Complaint Adequately Pleads Pre-September 15th Actionable
Misstatements and Omissions*

Defendants' actions prior to September 15, 2008 provide an independently sufficient

basis for liability under Section 10(b) and Rule 10b-5.  Contrary to Defendants' assertions,

---

[3] These misstatements relate to, *inter alia*, Defendants' stated intention and ability to enter into credit support agreements to preserve the $1.00 NAV, SAC ¶¶ 62, 92-111, 115-16, 159(d); Defendants' wrongful prioritization of certain redemption requests and selective disclosure to certain investors, *id.* at ¶¶ 77-82, 159(f); and Defendants' misinformation regarding the number and amount of redemption requests and the reason for the Fund's inability to honor requests, *id.* at ¶¶ 83, 85, 96, 117-22, 133-34, 159(g).  Adequate scienter allegations are also apparent. Defendants were motivated by their desire to attract new investments, increase the assets under management, increase the fees they were generating, and preserve their reputations.  *See, e.g.*, *Id*. at ¶¶ 4, 28-29, 50.  As the heads of the Primary Fund, they had every opportunity to perpetrate these frauds.  *Id*. at ¶¶ 28-32, 34-38.

Plaintiffs adequately plead several actionable misstatements and omissions by Defendants.  As the Complaint details, the Primary Fund had invested in very conservative assets, such as government securities and bank certificates of deposit, from its inception in 1971.  SAC ¶ 49.  Defendant RMCI repeatedly trumpeted the safety and liquidity of funds invested in the Primary Fund.  *Id.*  After 2006, however, Defendants implemented a material change in the investment objectives and strategy of the Fund – purchasing riskier commercial paper in high concentrations, with a higher risk/reward profile than it previously had, in order to produce higher yields and attract new investments to the Fund.  *Id.* at ¶ 50.

Despite this shift in investment objective towards a concentration in riskier investments in pursuit of higher returns, Defendants continued to portray the Primary Fund at all times as though it were as conservative as ever.  In various SEC filings, Defendants continued to tout the Fund's "sanctity of principal, immediate liquidity" and "overarching rubric of boring investors into a sound sleep."  *Id.* at ¶ 46.  "[P]reservation of capital and liquidity" was listed as a "fundamental policy."  *Id.* at ¶ 44; Skinner Decl. Ex. J at 67 of 108.  Defendants specifically noted that since money market funds were designed to be low-risk strategies, they typically produce lower returns than investments in stocks and bonds, stating that "[d]ifferent investors have different investment goals.  Investments in money market funds provide greater security and liquidity than other types of investments but do not usually offer as high a rate of return."  SAC ¶ 43; Skinner Decl. Ex. J at 11 of 108.  Defendants added that an investment in the Primary Fund "is definitely not money to take risks with, and that is exactly how it should be managed."  SAC ¶ 46.  Defendants repeated these representations in the popular press, telling the *Wall Street Journal* as late as September 12, 2008 – three days before Lehman's bankruptcy and the Fund's collapse – that the Primary Fund was still designed to "bore the [] investor into a sound night's

sleep." *Id*. at ¶ 53; Skinner Decl. Ex. K at 2.  These representations were designed to entice

current and new investors to invest in the Primary Fund, despite the fact that Defendants knew,

or recklessly disregarded, that the Primary Fund was not the safe investment they touted it to be.


Defendants argue that the Primary Fund's investment strategy was accurately described

because the Fund's SEC filings had added commercial paper to the list of permissible

investments, and the resulting investments in Lehman and other paper were listed in the Fund's

periodic holding reports.  *See* Def. Mem. Ex. B. at 15-20.[4]  According to Defendants, therefore,

the Complaint is merely impugning the Fund disclosures using "hindsight," because the Fund's

commercial paper "was more risky [sic] than expected." *Id.* at 19.  This argument fails,

however, because merely adding commercial paper to the roster of permissible investments

cannot serve to inoculate Defendants from liability for the material change in investment strategy

and the resulting high concentrations in commercial paper that they undertook without adequate

disclosure.  Nowhere did the Fund's disclosures regarding investment strategy or holdings

indicate or give any impression that the commercial paper holdings of the Fund were or would be

so concentrated that the Fund would risk "breaking the buck" upon the bankruptcy of a *single*

*company* – a startling level of risk in the context of a money market fund.  To the contrary, the

Fund's marketing materials continued – both before and after the run-up in commercial paper

investments – to give just the opposite impression, reassuring investors that the Fund's strategy

remained ultra-conservative and even "boring," as noted above.  The disclosures now touted by

Defendants, in the face of the many reassurances to the contrary, cannot be read to have

reasonably put Plaintiffs on notice of the true risk of the concentrated commercial paper holdings

---

[4] This argument from the Class Action motion to dismiss was incorporated by reference into
Defendants' brief in this case – along with a number of the other arguments discussed herein.

in this money market fund.  Particularly in the context of a motion to dismiss, where inferences must be drawn in favor of Plaintiffs, there is no basis to conclude as a matter of law that the Fund's disclosures were not materially misleading.

For the same reasons, it is unavailing for Defendants to argue that the SEC authorizes money market fund investments in commercial paper and thus that "most market participants (consistent with the SEC's view) considered commercial paper to be a 'safe asset' . . . ."  Def. Mem. Ex. B at 16-17.  As an initial matter, Defendants are not entitled on a motion to dismiss to the proposed inference that the market perceived commercial paper held in a money market fund as a safe asset.  Even granting Defendants the benefit of that inference, a general market perception of commercial paper as a "safe asset" actually *contradicts* Defendants' assertion that Primary Fund shareholders were put on notice of the Fund's true riskiness by the disclosure that the portfolio included Lehman paper.

Equally unhelpful to their position is Defendants' assertion that the Primary Fund's overall investments in commercial paper were in line with those of other money market funds. *Id.* at 17.  First, this is plainly a factual matter that is beyond the scope of the well-pleaded Complaint, and has no place in the Court's consideration of a motion to dismiss.  Second, the suggestion that the Primary Fund's disclosures were adequate because its holdings were in line with everyone else's is flatly belied by the established record.  Indeed, no other money market fund "broke the buck" following Lehman's bankruptcy, providing compelling evidence that the Primary Fund's commercial paper was atypically risky and concentrated.

Finally, Defendants argue that their statements concerning the Fund's "goals" of "safety of principal, liquidity, and soundness of sleep," *id.* at 15, are immaterial as a matter of law, since "[t]here is no reason to believe that any investor would consider these statements . . . in making

-10-

his or her investment decision." *Id.* at 21. The misstatements and omissions highlighted in Plaintiffs' Complaint, however, are precisely the type of statements upon which an investor would rely in making an investment decision. Plaintiffs were seeking "preservation of capital and virtually immediate access to their funds," SAC ¶ 2, and invested money with the Primary Fund because of Defendants' continuous, blanket representations that they provided these features.

### 2.   *The Complaint Adequately Pleads Pre- September 15th Scienter*

The facts alleged in the Complaint are more than sufficient to establish both that Defendants had the motive and opportunity to commit fraud, and the strong circumstantial evidence of conscious misbehavior or recklessness on the part of Defendants. It cannot be disputed that as owners, directors, and managers of the Primary Fund, Defendants had sufficient opportunity to commit these fraudulent acts. Since RMCI and Reserv Partners (the investment advisor and distributor of the Fund, respectively) are owned and controlled by the Bents and receive fees for their services in relation to assets under management, the Bents have a direct financial motive to maximize both their personal equity in the firms and the management fees received by RMCI and Resrv Partners. SAC ¶¶ 4, 28-29, 50; Skinner Decl. Ex. I at 14. Moreover, as this Court has recognized, the "Bents also have an enormous reputational stake in the Primary Fund." Skinner Decl. Ex. I at 14. Bent Sr. founded RMCI and the Primary Fund more than 35 years ago; he has long sought the limelight as the "public face" of RMCI and its funds, and his family, including Bent II, control the Reserve Funds and their associated entities. *Id.*; SAC ¶¶ 28, 30-34, 40. As this Court noted, Defendants' "personal stake in the success of the Primary Fund goes far beyond that held by typical officers and directors." Skinner Decl. Ex. I at 14. Defendants claim that receipt of fees alone may not satisfy the motive requirement, *see Def. Mem. Ex. B at 22*, but the added financial and reputational incentives in this case distinguish this

situation from the fees-only cases upon which Defendants rely.  *See also Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 620-21 (S.D.N.Y. 2008) (finding sufficient motive where the defendants "possessed the unique incentive, as managers of a struggling, privately-owned investment fund in which they possessed a personal financial stake," to attempt to maximize not only their "personal financial investment" but also their "potential receipt of management fees"); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*, 446 F. Supp. 2d 163, 187 (S.D.N.Y. 2006) ("[u]nlike a motive to increase stock prices, shared by all corporate insiders, a motive to generate increased fees based on inflated NAV figures would be 'a concrete and personal benefit to the individual defendants'") (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).

Moreover, the Complaint sufficiently pleads that Defendants knew facts, or had access to information, that demonstrated their public statements were not accurate.  As discussed above, Defendants had recently begun investing in riskier commercial paper.  Regardless of how Defendants try to portray it now, the decision to invest in commercial paper was a decision to invest in a riskier security than the securities previously comprising the Fund, motivated by a desire to raise the return and thus increase assets under management.  This undisclosed shift in the Fund's investment objective, combined with Defendants' inability to provide a credit backstop, meant that Defendants knew, or should have known, that the risks in the Fund had materially increased.  Despite this, the Defendants continued to make public statements about the stability and liquidity of the Primary Fund.

### B.    The Complaint Adequately Pleads Reliance

Finally, contrary to Defendants' assertions, Plaintiffs have sufficiently alleged reliance for their claims under Section 10(b) and Rule 10b-5.  Defendants offer no explanation as to why arguments made in the Class Action Memorandum regarding the problems applicable to alleging

*class-wide* reliance – incorporated by reference into their Motion in this case – would apply to Plaintiffs' *individual* Complaint.  As alleged in the Complaint, Plaintiffs relied upon Defendants' representations that the Fund offered preservation of capital and virtually immediate liquidity in choosing to invest in the Primary Fund.  SAC ¶ 2.  Moreover, Ameriprise bought additional shares of the Primary Fund on September 15 and 16 as Defendants continued to mislead investors about the Primary Fund's liquidity, the $1.00 inflated NAV, the causes for delays in redemptions, and the existence of credit support agreements available to maintain the $1.00 NAV.  *Id*. at ¶¶ 19, 149-150.  Indeed, Ameriprise made substantial purchases at a $1.00 NAV when the Fund's shares were actually worth materially less than that.  Additionally, Plaintiffs would not have invested in the Primary Fund at any time had they known that Defendants would disclose material non-public information to select investors and prioritize certain redemptions over others, as Plaintiffs allege they did.  *Id*. at ¶¶ 77-82.

Independently, Plaintiffs are entitled to a presumption of reliance pursuant to the fraud-on-the-market doctrine on the theory that the false and misleading statements detailed in the Complaint were disseminated into the marketplace and were reflected in the total mix of information about the Primary Fund known to investors.  *Id*. at ¶ 151; *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988) ("Requiring a plaintiff to show a speculative state of facts, *i.e.*, how he would have acted if omitted material information had been disclosed, or if the misrepresentation had not been made, would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market.") (internal citations omittted).  In an effort to negate this presumption, Defendants argue that since the share price of the Fund is "unaffected by alleged misrepresentations and omissions concerning the fund itself," there is no efficient market for the securities in question.  Def. Mem. Ex. B at 25 (internal quotation marks and

citation omitted).  This argument is baseless, because Defendants' misrepresentations and omissions clearly *did* affect the share price.  As discovery has shown, Defendants artificially propped up the share price at a $1.00 throughout the day on September 15 and into September 16, through their misrepresentations to the Board, investors, and ratings agencies.  SAC ¶¶ 7, 11.  This allowed some investors to redeem at  $1.00 NAV when the Fund's shares were worth materially less, leaving Plaintiffs and others "holding the bag" – in this case, holding the illiquid and practically valueless Lehman paper.  Once these misrepresentations came to light, the buck was broken, and the share price fell via the Board's resetting of the NAV.  There is a clear connection between Defendants' fraud and the subsequent market price.  *See also*, *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 131 (S.D.N.Y. 2001) (noting that "[c]ourts presume reliance 'where it is logical to presume that reliance in fact existed'" and allowing presumption of reliance based on the integrity of the NAVs calculated, issued, and confirmed by Defendants).

### C.    Securities America Has Standing to Sue for Securities Fraud

Defendants assert that SAI has no standing to make a Rule 10b-5 claim because it did not purchase additional shares of the Primary Fund on or after September 15, 2008.  According to Defendants, SAI was thus "nothing more than a holder of securities at the time of the alleged fraud."  Def. Mem. at 7.  But this argument assumes (without saying as much) that the only acts of fraud alleged by Plaintiffs are those that occurred on September 15 and 16, 2008.  However, as explained above, Plaintiffs, including SAI, purchased shares of the Primary Fund based on Defendants' earlier misrepresentation regarding the stability and liquidity of the Fund.  Accordingly, SAI, just like Ameriprise, has standing to sue under Section 10(b) and Rule 10b-5.  The fact that SAI itself may not have purchased additional shares on or after September 15 does not deprive SAI of standing, particularly when its assignors/customers may well have.

## II.   THE COMPLAINT SUFFICIENTLY PLEADS A CAUSE OF ACTION UNDER SECTION 20(A) OF THE EXCHANGE ACT.

In order to establish a prima facie case of liability under Section 20(a) of the Exchange Act, plaintiffs must allege (1) a primary violation of the Act by a controlled person and (2) direct or indirect control by the defendant of the primary violator. *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 618 (S.D.N.Y. 2008).  Additionally, Section 20(a) claims must allege culpable participation by the controlled persons.  *Id*.  Defendants do not dispute Plaintiffs' allegations that the Bent Defendants are "control persons" within the meaning of Section 20 of the Exchange Act.  Instead, Defendants argue that Plaintiffs' Section 20(a) claim fails since a primary violation of Section 10(b) was not adequately alleged.  As detailed above, Plaintiffs have sufficiently alleged a primary violation of Section 10(b) and Rule 10b-5 and accordingly have adequately pled a claim against the Bent Defendants for violations of Section 20(a) of the Exchange Act.

## III.   THE COMPLAINT SUFFICIENTLY PLEADS A CAUSE OF ACTION UNDER SECTION 11 OF THE SECURITIES ACT

Defendants are incorrect in asserting that the Complaint fails to satisfy the pleading standards for a claim under Section 11 of the 1933 Act, whether heightened or not.  *See* Def. Mem. at 8.  Section 11 was designed to assure compliance with the disclosure provisions of the 1933 Act by imposing a stringent standard of liability on parties who play a direct role in registered offerings.  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  Elements of reliance and scienter are not required under Section 11.  *See In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208, 2006 WL 1008138 at \*6 (S.D.N.Y. Apr. 18, 2006) (citing *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 337 (S.D.N.Y. 1996)).  To establish a prima facie Section 11 claim, a plaintiff need only show that it bought the security and that there was a material misstatement or omission.  *See In re WRT*

*Energy Sec. Litig.*, No. 96 Civ. 3610, 2005 WL 2088406 at *1 (S.D.N.Y. Aug. 30, 2005).  The

liability of the issuer of a materially misleading registration statement is "virtually absolute, even

for innocent misstatements."  *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562,

568-69 (S.D.N.Y. 2009) (quoting *Herman*, 459 U.S. at 382).

       Plaintiffs have met this threshold for pleading a Section 11 violation.  As detailed above,

Defendants made material misstatements and omissions in their SEC filings about the Fund's

change in investment objective and heightened risks, as well as safety and liquidity.  *See* Section

I, *supra*.  The Bents approved these public communications prior to dissemination.  SAC ¶ 37.

In addition, Defendants' Registration Statement assured investors and the public that the Trust

and its agents "do not expect to disclose information about portfolio holdings that is not publicly

available to individual and institutional investors" – which was breached during the Fund's

meltdown.  *Id.* at ¶ 171; Skinner Decl. Ex. J at 74 of 108.  The Registration Statement also set

forth share redemption procedures that were markedly different than those followed by the Trust

and its agents on September 15, 2008.  SAC ¶ 172; Skinner Decl. Ex. J at 29, 94-95 of 108.

Knowledge that the Trust would selectively disclose information about the Fund to certain

favored investors – and had no procedures in place to hew to the representations in its

Registration Statement – would have significantly altered Plaintiffs' decision to invest in the

Fund.  That is more than enough to state a Section 11 claim.

       Defendants try to disclaim responsibility by arguing that the Court should reject any

attempt by Plaintiffs to use hindsight to attach liability to Defendants' actions.  *See, e.g.*, Def.

Mem. Ex. B at 19.  But Plaintiffs' allegations are not based on hindsight.  Rather, Plaintiffs claim

that Defendants knew, or recklessly disregarded, that they were making material misstatements

and omissions at the time they were made.  Driven by a desire to increase assets under

management, Defendants changed the Primary Fund's investment strategy, yet failed to change its marketing of the Fund as a safe, stable, and liquid investment.

Similarly, Defendants' Registration Statement contained material misstatements by assuring investors precisely how Defendants *would* communicate non-public information to investors, and handle redemption requests.  Yet Defendants failed to create, let alone follow, any procedures with regard to investor communications and redemptions on September 15 and 16, 2008.  There is no evidence that any of Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the communication procedures outlined in the Registration Statement were true, were without omissions of material facts, and were not misleading.  That possibility alone is enough to justify further investigation.  *See, e.g.*, *AngioDynamics, Inc. v. Biolitec, Inc.*, 606 F. Supp. 2d 300, 303 (N.D.N.Y. 2009) (noting that a pleading survives a motion to dismiss if it "demonstrate[s] 'reasonably founded hope that the discovery process will reveal relevant evidence to support the claim.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 559 (2007)).  In fact, further investigation in this case may reveal that Defendants lacked any meaningful internal controls or procedures to ensure that the representations made in the Registration Statement would be upheld.[5]  Without such mechanisms in place, Defendants would be hard pressed to show they had reasonable grounds to believe statements in their Registration Statement were true.[6]

---

[5] As noted above, the SEC has conducted extensive discovery concerning Defendants' activities with respect to redemption levels and the supposed credit support agreement.  Plaintiffs are unaware of any additional discovery yet taken (other than their own very limited discovery) concerning the alleged improper selective disclosures.

[6] Defendants assert that "[s]ince RMCI was not an issuer, director, or underwriter, it cannot be liable for violating Section 11."  Def. Mem. at 8.  But RMCI cannot evade its involvement with the material misstatements and omissions in the Fund's SEC filings.  As the Fund's investment advisor, RMCI has a high level of control of all operations, including the content of the prospectuses, and is so inextricably linked to all other Defendants such that a reasonable investor

**IV.    THE COMPLAINT SUFFICIENTLY PLEADS A CAUSE OF ACTION UNDER
SECTION 12(A)(2) OF THE SECURITIES ACT**

Plaintiffs have also properly pled a claim under Section 12(a)(2) of the Securities Act,
which states that "any person who . . . offers or sells a security . . . by means of a prospectus or
oral communication, which includes an untrue statement of a material fact or omits to state a
material fact necessary in order to make the statements . . . not misleading . . . shall be liable . . .
to the person purchasing such security from him."  15 U.S.C. § 77l(2) (1998).  Defendants claim
they are not "sellers" within the meaning of Section 12(a)(2), yet provide no citations or
explanation to support their *ipse dixit* assertion.  A person is a "seller" under §12(a)(2) if they
either "(1) transferred title to the securities at issue; or (2) actively solicited the sale of the
securities with a motivation to serve its own financial interests or those of the securities owner."
*Griffin v. PaineWebber Inc.*, 84 F. Supp. 2d 508, 515 (S.D.N.Y. 2000).  Here, Defendants
solicited Plaintiffs' purchases of shares by preparing and distributing the false and misleading
prospectuses.  SAC ¶ 182.  Defendants solicited these purchases of Fund shares in order to serve
their own financial interest.  SAC ¶ 50.  As such, Defendants are "sellers" within the meaning of
the statute.  *See, e.g.*, *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424,
439 (S.D.N.Y. 2000) (finding defendant a seller despite not being the owner of the securities
since they participated in the preparation of the registration statement and prospectus and in road
shows with a motivation to serve its own financial interest or those of the owner).

---

could, and did, attribute the statements made in the Fund's SEC filings to RMCI.  *See
Tannenbaum v. Zeller*, 552 F.2d 402, 405 (2d Cir. 1977) (noting that the management structure
of a mutual fund "contrasts sharply" with that of a typical corporation and that "control of mutual
funds . . . lies largely in the hands of the investment adviser"); *cf. Pac. Inv. Mgmt. Co. LLC v.
Mayer Brown LLP*, 603 F.3d 144, 158 n.6 (2d Cir. 2010) ("There may be a justifiable basis for
holding that investors rely on the role corporate executives play in issuing public statements even
in the absence of explicit attribution.").

-18-

**V.      THE COMPLAINT SUFFICIENTLY PLEADS A CAUSE OF ACTION UNDER SECTION 15 OF THE SECURITIES ACT**

In order to plead a claim under Section 15 of the Securities Act, plaintiffs must allege (1) a primary violation of the Act by a controlled person and (2) direct or indirect control by the defendant of the primary violator.  *Garber*, 537 F. Supp. 2d at 617.  Defendants do not dispute Plaintiffs' allegation that the Bent Defendants are "control persons" within the meaning of Section 15 of the Securities Act.  Defendants instead argue that Plaintiffs' claim under Section 15 fails because Plaintiffs have not established primary violations of either Section 11 or Section 12(a)(2) of the Securities Act.  As demonstrated above, Plaintiffs have adequately pled primary violations of both Sections 11 and 12(a)(2) of the Securities Act, and accordingly have adequately pled a violation of Section 15.

**VI.     THE COMPLAINT SUFFICIENTLY PLEADS CAUSES OF ACTION FOR THE STATE LAW CLAIMS**

    **A.      SLUSA Does Not Preempt Plaintiffs' State Law Claims**

        ***1.      This Case Does Not Qualify as a "Covered Class Action"***

Defendants argue that Plaintiffs' state law claims are preempted by the Securities Litigation Uniform Standards Act ("SLUSA") because Plaintiffs' lawsuit qualifies as a "covered class action" in either one of two ways.  Def. Mem. at 9-10.  Specifically, Defendants assert that Plaintiffs' lawsuit is a "covered class action" because it has been "consolidated" with the Class Action for pretrial processing pursuant to 28 U.S.C. § 1407, *id.* at 10, or because it seeks damages on behalf of more than 50 people.  *Id.* at 11.  Both of these arguments are incorrect.

First, the *centralization* of this action with the Class Action in the MDL for pretrial purposes does not create a valid basis to treat this case as a "covered class action" under SLUSA. To the contrary, Ameriprise and SAI have affirmatively opted out of the Class Action in order to pursue their own individual claims.  Under these circumstances, it would be illogical to treat

-19-

these claims as a "class action," as no part of Congress' goals in enacting SLUSA would be furthered by preempting claims of plaintiffs who opt out, like Ameriprise and SAI.  Second, the case law relied upon by Defendants to urge a contrary result is inapplicable, with facially distinguishable fact patterns.  Defendants rely primary on *In re Worldcom, Inc. Securities Litigation*, 308 F. Supp. 2d 236 (S.D.N.Y. 2004).  In *Worldcom*, the ten consolidated complaints were verbatim copies of each other, all alleging the exact same claims and all containing the exact same typographical errors.  *See id*. at 240 n. 6 (noting that Plaintiffs filed ten identical sets of *all* their court papers, not just their complaints).  Moreover, the ten complaints were all filed by the same counsel, in an apparent subterfuge to avoid "covered class action" status.  *Id*. at 240. Here, Plaintiffs' Complaint is separate and distinct from the Class Action complaint in a number of ways.  First, Plaintiffs have filed claims under Minnesota state statutes while the Class Action plaintiffs have not.  SAC ¶¶ 207-17.  Second, Plaintiffs' Complaint is devoid of a number of the claims alleged in the Class Action complaint, including claims under sections 13(a) and 36(b) of the Investment Company Act, and the state law claim for unjust enrichment.  Def. Mem. Ex. F at ¶¶ 244-65; 284-89.  Finally, the two complaints at issue here were filed by different counsel.

Defendants' reliance on *Gordon Partners v. Blumenthal* is similarly misplaced.  There, Plaintiffs had previously *requested* that their action be consolidated with the class action for pre-trial purposes.  *See* No. 02 Civ. 7377, 2007 WL 431864, *17 (S.D.N.Y. 2007) (identifying plaintiffs' lawsuit as a "covered class action" since plaintiffs' action and the class action had proceeded as a single action for pre-trial purposes since the date of plaintiffs' prior request for consolidation).  Here, Defendants themselves recognize that Plaintiffs have objected to the centralization of their claims with other lawsuits from the very beginning, opposing the MDL transfer and opting out of joining the Class Action.  *See* Def. Mem. Ex. E at 1.

-20-

Indeed, Defendants have sought to draw the distinction between Plaintiffs' Complaint and the Class Action Complaint in objecting to Plaintiffs' request to have the same discovery rights as ordered for the Class Action. *See* Skinner Decl. Ex. J (Defendants' July 20, 2010 letter to Judge Gardephe objecting to Plaintiffs' participation in the SEC discovery, stating that "[w]hatever factors may have resulted in the class plaintiffs being allowed to take part in discovery . . . at this time, they do not exist for Ameriprise."). In arguing that the factors permitting the Class Action to be on the same discovery track as the SEC Action are different for Plaintiffs, Defendants concede the differences between the two actions and thus that Plaintiffs' lawsuit should not be considered a "covered class action."

*Second*, contrary to Defendants' assertions, Plaintiffs are not bringing the Complaint "on behalf of more than 50 persons"; Ameriprise and SAI are the sole beneficiaries. Defendants cite to Plaintiffs' First Amended Complaint, filed in September 2008, while ignoring the updated allegations of the 2010 operative Complaint. Def. Mem. at 11. Since the filing of Plaintiffs' First Amended Complaint, Ameriprise and SAI have paid their respective clients up to 3 cents on the dollar to reimburse them for losses incurred in the Primary Fund. SAC ¶¶ 26-27. Thus, the "well in excess of 50 persons" that Defendants claim Plaintiffs are seeking damages on behalf of, have already been paid, and will receive no additional benefit from any damages awarded in the pending litigation. Instead, all money awarded will go to repay Ameriprise and SAI.[7] SAC ¶ 148; *see also*, 15 U.S.C. § 78bb(f)(5)(D) (providing that "a corporation, investment company, pension plan, partnership, or other entity, shall be treated as one person or prospective class member, but only if the entity is not established for the purpose of participating in the action.").

_____

[7] A point Defendants appear to concede later in their Motion where they argue that "Plaintiffs are only seeking damages for their own personal account." Def. Mem. at 15.

-21-

The cases that Defendants rely upon stress that Plaintiffs, organized as trusts, could not be considered single entities under SLUSA because they were established for the *purpose* of litigating shareholder claims.  *See LaSala v. Bordier et Cie*, 519 F.3d 121, 132-33 (3d Cir. 2008); *RGH Liquidating Trust v. Deloitte & Touche LLP*, 891 N.Y.S.2d 324, 333 (N.Y. App. Div. 2009).  Here, of course, Plaintiffs have not been established for the purpose of litigating their clients' claims.  Plaintiffs themselves were directly injured and stand to be the only parties to benefit from this lawsuit, further differentiating this case from those cited by Plaintiffs.  *See, e.g. RGH*, 891 N.Y.S.2d at 332 (finding it significant that "[a]ny money recovered by the [RGH] Trust on the bondholders' claims *will be distributed to the bondholders* on a pro rata basis.") (emphasis in original).  Because Plaintiffs seek damages only on behalf of themselves and not their clients (whom they have already reimbursed), the pending litigation does not constitute a "covered class action" sufficient to preempt Plaintiffs' state law claims under SLUSA.

### 2.   *Plaintiffs' State Law Claims for Breach of Fiduciary Duty and Gross Negligence are not preempted by SLUSA*

Even assuming *arguendo* that this action qualifies as a covered class action under SLUSA, Plaintiffs' state law claim for breach of fiduciary duty should not be preempted by SLUSA, since it does not sound in fraud.[8]  *LaSala v. TSB Bank, PLC*, 514 F. Supp. 2d 447, 473 (S.D.N.Y. 2007) (noting that each individual claim in complaint must have fraud as a "necessary component" in order for claim to be preempted by SLUSA).  In order to state a claim for breach of fiduciary duty under Minnesota law, a plaintiff need only allege the existence of a duty, a breach of the duty, damages as a result of the breach, causation, and damages.  *Rucki v. Grazzini*, 27-CV-07-24406, 2010 WL 1286725, *5 (Minn. App. Apr. 6, 2010).  Plaintiffs have done this, alleging that Defendants owe fiduciary duties to Fund shareholders, SAC ¶ 196; that Defendants

---

[8] Defendants concede that Plaintiffs' claim for gross negligence is not preempted by SLUSA. Def. Mem. at 12.

breached those duties, *id*. at ¶¶ 196-197; and that the breach proximately caused Plaintiffs' injuries. *Id*. at ¶¶ 12, 21, 77-82, 198.

None of Plaintiffs' allegations regarding Defendants' breach of fiduciary duty is dependent on proving fraudulent conduct. *Id*. at ¶ 197. Defendants nonetheless attempt to recast Plaintiffs' allegation that Defendants made selective disclosures to certain investors as a fraudulent omission and thus subject to SLUSA preemption. Def. Mem. at 12. But such recasting is an improper basis for SLUSA preemption. *See, e.g.*, *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 386-87 (S.D.N.Y. 2004) (stating that defendants cannot seek to avoid a claim by recasting it as one depending on establishing a material misrepresentation or omission); *Paru v. Mut. of Am. Life Ins. Co.*, No. 04 Civ. 6907, 2006 WL 1292828 at *3 (S.D.N.Y. May 11, 2006) (noting that a defendant cannot simply recast a fiduciary duty claim as being allegedly based on fraud in order to trigger SLUSA preemption). Plaintiffs' claim is not that Defendants' selective disclosures contained material misstatements or omissions. Rather, Plaintiffs claim that Defendants violated their fiduciary duties by placing their own financial interests and those of favored investors over the interests of less-favored investors. Such a claim is not preempted by SLUSA. *See, e.g.*, *Xpedior Creditor Trust v. Credit Suisse First Bos. (USA) Inc.*, 399 F. Supp. 2d 375, 383 n.40 (S.D.N.Y. 2005) (holding breach of fiduciary duty claim based on sharing of profits between Defendant and favored customers was not preempted by SLUSA); *Norman*, 350 F. Supp. 2d at 386-87 (holding breach of fiduciary duty claim based on Defendant placing its financial interests in conflict with those of Plaintiffs was not preempted by SLUSA).

**B.   Plaintiffs' Claims for Breach of Fiduciary Duty and Gross Negligence are Direct Claims and Need Not Have Been Brought Derivatively**

Defendants argue that Plaintiffs' claims for breach of fiduciary duty and negligence are derivative claims, and thus should be dismissed for failure to make a demand on the Fund prior to bringing the case.  Def. Mem. at 13-14.  Once again, Defendants do nothing more than reference the Class Action Motion to Dismiss as support for this assertion.  Plaintiffs' claims are not derivative in nature and thus no demand on the Fund was required.

It is true that a shareholder is not permitted to directly sue a corporation or other wrongdoer if the only injury alleged is a diminution of the corporation's net worth.  *See Hurley v. FDIC*, 719 F. Supp. 27, 30 (D. Mass. 1989).[9]  In such an instance, the claim must be brought derivatively.  *Id.*  On the other hand, where shareholders themselves have been defrauded and have suffered direct harm as a result of the wrongdoer's actions, such a claim is considered direct and can be brought directly against the corporation.  *See id.*; *see also Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass. 1996) ("[I]f a plaintiff alleges that she, as an individual investor, was misled or defrauded in the purchase of her investment, this kind of claim is a 'direct' one."); *Diamond v. Pappathanasi*, No. SUCV2007-4117BLS1, 2009 WL 1539792, at *7 (Mass. Sup. June 3, 2009) ("[S]hareholders may resort to a direct, personal action against a miscreant fiduciary where the shareholders themselves have been defrauded, where it is difficult to establish a breach of a duty owed to the corporation, or where a corporate recovery would not provide a just measure of relief to the complaining shareholder.").

Here, Plaintiffs were directly harmed by Defendants' actions – including differential treatment of shareholders – incurring a significant amount of damage as a result.  For example, Defendants wrongfully prioritized redemption requests received on September 15, 2008,

---

[9] The parties are in agreement that Massachusetts law applies to this issue.  Def. Mem. Ex. B at 29 n.68.

resulting in certain favored investors being allowed to redeem at the full (inflated) $1.00 NAV before redemptions ceased, leaving Plaintiffs with shares worth considerably less than otherwise would have been the case.  There is no basis to assert that the harms suffered by Plaintiffs due to this conduct are merely derivative of harm suffered by the Fund, when the Fund's various shareholders were harmed differentially as a direct result of Defendants' conduct.  Accordingly, Plaintiffs' claims for breach of fiduciary duty and gross negligence are direct and should not be dismissed for failure to make demand.

       **C.**    **Plaintiffs Have Sufficiently Alleged Violations of the Minnesota Consumer Protection Statutes**

      In Count IX of the Complaint, Plaintiffs allege that Defendants' selective disclosures to certain investors, and prioritization of certain redemptions over other redemptions, constitutes a violation of the Minnesota Consumer Fraud Act ("MCFA").  SAC ¶¶ 209-11.  In Count X of the Complaint, Plaintiffs allege that Defendants' Prospectuses, Registration Statements, and other public statements were false statements in advertising in violation of the Minnesota False Statement in Advertising Act ("MFSAA").  *Id*. at ¶¶ 214-17.   Unable to dispute the impropriety of their conduct, Defendants again resort to unsupported arguments about technical pleading standards in an effort to seek dismissal of these counts.

          *1.*    *Plaintiffs Have Standing to Sue Under the Minnesota Consumer Protection Statutes Because the Claims Will Yield a Public Benefit*

      Defendants argue that the Plaintiffs' claims under the MCFA and MFSAA are not directed towards procuring any public benefit.  This is simply incorrect.  Plaintiffs' action benefits the public because Defendants' actions were aimed at the public at large.  Defendants look to *Ly v. Nystrom*, 615 N.W.2d 302 (Minn. 2000) to support their contention that no public benefit would be yielded here.  Def. Mem. at 15.  In *Ly*, the Minnesota Supreme Court focused its analysis on the individual nature of the dispute, which involved a single one-on-one

transaction in which the fraudulent misrepresentation was made only to appellant.  615 N.W.2d at 313-14.  However, the analysis of the Minnesota Supreme Court in *Collins v. Minnesota School of Business Incorporated*, 655 N.W.2d 320 (Minn. 2003) distinguishes *Ly* from this action.  In *Collins*, the Court found that the trial court incorrectly applied *Ly*'s public benefit test by focusing on the number of persons who were injured, and ignoring the fact that the defendants misrepresented their program to the "public at large." *Id.* at 330.  The logic of *Collins* directly applies here.  Defendants misrepresented to the public at large, through the Fund's SEC filings and other public statements, the firm's change in investment strategy, the favored treatment of larger clients, the way information would be disseminated to shareholders, and the methods by which redemption requests would be handled.  Plaintiffs' action seeking redress of these deceptive acts therefore does have a public benefit.[10]  *See id.*; *see also Ali v. Francois*, No. CT 02-002459, 2003 WL 23515768, at *3-4 (Minn. Dist. Ct. Nov. 5, 2003) (stating that whether the action will benefit the public at large does not turn on the number of plaintiffs to the action, but on the potential for the activities of the defendant to affect a large number of people).

Lest there be any doubt that this litigation involves matters of public interest, the Court need look no further than the fact that at least two governmental entities have now taken enforcement actions against Defendants.  The SEC and the Massachusetts Securities Division have both found Defendants' actions sufficiently of concern to the public that they felt action was warranted.[11]

---

[10] The fact that Plaintiffs' MCFA and MFSAA claims would confer public benefits does not convert this case into a covered class action.  Plaintiffs have brought claims based on the money they have lost due to Defendants' actions.  It would be a welcomed benefit should the redress of Plaintiffs' claims result in benefit to other harmed Fund investors.  It does not, however, somehow convert this action into something it is not.

[11] At most, it is too early to determine conclusively that Plaintiffs' action would not have a public benefit.  *See Indep. Glass Ass'n. v. Safelite Grp., Inc.*, No. 05-238, 2005 WL 2093035, at

2.       *Plaintiffs Qualify as "Consumers"*

Defendants also try to argue that Plaintiffs are not entitled to the protection of the MCFA or MFSAA because they are not within the class of individuals the statutes were intended to protect.  Defendants state that the "[a]cts are aimed at protecting 'consumers' and are meant 'to address the unequal bargaining power that is often found in consumer transactions.'"  Def. Mem. at 15-16.  In evaluating the applicability of the Minnesota consumer protection statutes, the Minnesota Supreme Court has distinguished between a consumer entitled to protection under the Acts and a merchant not entitled to their protection.  *See Church of the Nativity of Our Lord v. Watpro*, 491 N.W.2d 1, 7-8 (Minn. 1992), overruled on other grounds by *Ly*, 612 N.W.2d at 314 n. 25.  The consumer protection statutes do not define the term "consumer."  However, the Minnesota Supreme Court has determined that the legislative history "clearly indicates that the [statutes were] intended to protect a broad, though not limitless, range of individuals."  *Ly*, 615 N.W.2d at 310.  See also *State by Humphrey v. Alpine Air Prod., Inc.*, 490 N.W.2d 888, 892 (Minn. Ct. App. 1992) ("[C]onsumer protection statutes are remedial in nature and are to be liberally construed in favor of protecting consumers.").

In arguing that Plaintiffs are not customers for purposes of the consumer protection statutes, Defendants mistakenly focus on the sophistication of Plaintiffs rather than on Plaintiffs' intended use of the product.  In *Ly*, cited by Defendants, the plaintiff was "a veteran of the restaurant business, had substantial bargaining power in the transaction and clearly purchased the restaurant for commercial, not personal, use."  615 N.W.2d at 309.  The court found that the plaintiff was a consumer because he purchased the restaurant not for the purposes of reselling it,

---

*6 (D. Minn. Aug. 26, 2005) (rejecting defendants' narrow interpretation of "public benefit," hypothesizing different ways a successful suit might bring about public benefits, and allowing plaintiff's claim to survive at "this early junction of the lawsuit").

but rather to sell restaurant services. *Id.* at 310. His status was thus more that of a consumer of the restaurant business rather than a buyer of a business for resale. *Id.*

Plaintiffs are in a similar position and qualify as "consumers" under the relevant statutes. Defendants cite to *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d. 1032 (D. Minn. 2003) to argue that broker-dealers are "merchants" under the MFCA. Def. Mem. at 16. What Defendants ignore, of course, is that while Plaintiffs are registered broker-dealers on behalf of thousands of investors, they were also acting as consumers in their *own* transactions with Defendants, buying securities for their own benefit. Ameriprise and Securities America had invested over $125 million combined of their own capital in the Fund. SAC ¶¶ 19-20. *See La Parilla, Inc. v. Jones Lang Lasalle Am., Inc.*, No. 04-4080, 2006 WL 2069207, at *7 (D. Minn. July 26, 2006) (noting that Minnesota courts have broadly construed the term "consumer" to include corporations and business-people).[12]

### 3. Plaintiffs Have Sufficiently Alleged Loss Causation for their MCFA and MFSAA Claims

The Complaint gives numerous, concrete examples of Defendants' deceptive practices and false statements and how these practices caused Plaintiffs' alleged damages. Plaintiffs have set forth specific references to the types of selective disclosures made by Defendants, and further set forth exactly what those disclosures caused – *e.g.*, redemption activity out of the Fund on September 15, 2008 that injured Plaintiffs and other shareholders by leaving them with shares worth less than they would have been. SAC ¶¶ 77-82, 149. Plaintiffs also aver that these

---

[12] Defendants also claim that securities are not merchandise under the MCFA (this argument does not apply to the MFSAA). Def. Mem. at 16. Defendants do not cite any case law for this proposition. Moreover, there is at least some Minnesota case law indicating that securities do indeed fall within the merchandise standard under MCFA. *LeSage v. Norwest Bank Calhoun-Isles, N.A.*, 409 N.W.2d 536, 539 (Minn. Ct. App. 1987) ("The Consumer Fraud Act applies to the sale of investment contracts, since the definition of 'merchandise' includes 'commodities' and 'intangibles.'") (citing *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 728 (Minn. 1983)).

-28-

deceptive practices in violation of the MCFA and MFSAA were the direct and proximate cause of Plaintiffs' alleged damages.  SAC ¶¶ 211, 217.

### 4.    *Plaintiffs Have Alleged Their MCFA and MFSAA Claims With Sufficient Particularity*

Again resorting to pleading standard arguments in the face of evidence of their wrongdoing, Defendants argue that Plaintiffs have not pled the Minnesota consumer protection claims with requisite particularity.  Def. Mem. at 17.  However, the MCFA reflects the legislature's intent "to make it easier to sue for consumer fraud than it had been to sue for fraud at common law."  *State by Humphrey v. Alpine Air Prod., Inc.*, 500 N.W.2d 788, 790 (Minn. 1993).  Minnesota courts have held that "a plaintiff 'need only plead that the defendant engaged in conduct prohibited by the statutes and that the plaintiff was damaged thereby.'  In other words, '[a]llegations of reliance are not necessary to state a claim under section 8.31, subdivision 3a, for damages resulting from a violation.'" *Wiegand v. Walser Auto. Grps., Inc.*, 683 N.W.2d 807, 811 (Minn. 2004) (emphasis and alteration in original) (quoting *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 12 (Minn. 2001)).  The detailed allegations of wrongdoing discussed above more than adequately plead a basis to proceed under the consumer protection statutes.  As such, Defendants' Motion should be denied as to Counts IX and X of the Complaint.

## <u>CONCLUSION</u>

For all of the reasons set forth above, Defendants' Motion to Dismiss should be denied as to all counts in Plaintiffs' Second Amended Complaint.

DATED: AUGUST 6, 2010

RESPECTFULLY SUBMITTED,

AMERIPRISE FINANCIAL, INC. AND
SECURITIES AMERICA, INC.


/s/ Harvey J. Wolkoff
Harvey J. Wolkoff
Robert A. Skinner
Ropes & Gray LLP
One International Place
Boston, MA  02110
(617) 951-7000

## <u>Certificate of Service</u>

I hereby certify that on this 6th day of August, 2010, I caused true and correct copies of this Opposition to Defendants' Motion to Dismiss the Second Amended Complaint to be served by e-mail and Federal Express on Counsel for Defendants in this action.

<u>/s/ Robert A. Skinner</u>
Robert A. Skinner